UNITED STATES of America, Plaintiff,

v.

SEVEN MISCELLANEOUS FIREARMS, Defendants.

Civ. A. No. 78–1358.

United States District Court, District of Columbia.

Aug. 4, 1980.

William H. Briggs, Jr., Asst. U. S. Atty., Washington, D. C., for United States.

Stephen N. Shulman and Joseph A. Artabane, Washington, D. C., for Nat. Rifle Assoc. of America.

## MEMORANDUM

GASCH, District Judge.

This is a forfeiture action filed by the United States pursuant to the provisions of 26 U.S.C. § 5801 et seq. against Seven Miscellaneous Firearms. The Court has jurisdiction under the provisions of 28 U.S.C.

§§ 1345, 1395 and 2461, et seq. The National Rifle Association filed a claim for the seven items at issue in this lawsuit and sought dismissal of the complaint or alternatively a more definite statement. Thereafter the United States filed a more definite statement and subsequently the Association withdrew its motion to dismiss or for a more definite statement and filed an answer to the complaint. The action was tried by the Court without jury. Upon consideration of the evidence adduced at trial, including the testimony, stipulations, and documents received in evidence, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The National Rifle Association maintains offices, a museum containing approximately 1500 items both sporting and military, which have been made inoperable, illustrating the development of American firearms, some dating back 350 years, as well as firearms records at 1600 Rhode Island Avenue, N.W., Washington, D.C. The Bureau of Alcohol, Tobacco and Firearms is charged with the responsibility of administering and enforcing the provisions of the National Firearms Act of 1968. 26 U.S.C. § 5801 et seq. On November 7, 1975, January 31, 1977, and November 15, 16, 18 and 21, 1977, the Bureau conducted compliance inspections of firearms records of the Association. On March 9, 1978, the following items [1] were seized by representatives of the Bureau on the premises of the Association:

1. Colt item, model AR–15, barrel length 21½ inches, overall length 38¼ inches, caliber 5.56 mm, serial number 039849 (Government Exhibit 1);

2. Heckler and Koch item, model G–3, caliber 7.62 mm, barrel length 20¼ inches, overall length 40¼ inches, no serial number (Government Exhibit 2);

---

1. Nomenclature is in dispute. The Bureau contends that proper terminology is firearm; the Association contends the proper term is display piece. The Court will hereafter use the term item.

3. Springfield Armory item, model T–44–E4, caliber 7.62 mm, barrel length 25 inches, overall length 44 inches, serial number 1200 (Government Exhibit 3);

4. Harrington and Richardson item, caliber 7.62 mm, model T–48, barrel length 24¼ inches, overall length 44½ inches, serial number 4142 (Government Exhibit 4);

5. Lee Enfield item, .303 caliber, barrel length 8⅞ inches, overall length 27⅞ inches, serial number 7446 (Government Exhibit 5);

6. MB Associates, Gyrojet item, 13 mm, serial number A–0029 (Government Exhibit 6);

7. MB Associates, Gyrojet item, 13 mm, serial number A–048 (Government Exhibit 7).

I.

*The Seven Items.*

Government Exhibit 1: This item is a prototype of the Colt AR–15. The ultimate design is described in Government Exhibit 23, prepared by the manufacturer, as follows: The AR–15 (M–16) rifle is gas operated, air cooled, magazine fed (20 or 30 rounds), semiautomatic or fully automatic shoulder weapon. The AR–15 is an earlier experimental version of what is now known as the M–16. The Association's curator described it as a milestone in the history of American firearms and an appropriate museum display piece.

Government Exhibit 1 cannot be fired either automatically or semiautomatically or otherwise because of missing parts and a welded barrel. The pretrial stipulation by and between counsel further shows that this item was deactivated at the factory before being donated by the manufacturer to the Association's Museum and it has no bolt cam pin, firing pin, firing pin retaining pin or automatic sear. The rear of the chamber has been plugged for a distance of approximately two and one quarter inches and the locking recess in the back of the barrel has been completely filled. It is impossible to close and lock the chamber with the bolt in this item.

The government expert, Edward M. Owen, demonstrated how Government's Exhibit No. 1 could be altered so that it would shoot automatically. He accomplished this by installing the upper receiver assembly and barrel of a fully operational Colt.AR–15, Government Exhibit No. 8, and by installing the complete bolt and carrier, the automatic sear assembly and its retaining pin in Government Exhibit No. 1. With these parts from an operational Colt AR–15, Government Exhibit No. 8, Mr. Owen testified that following this process, which included replacement of the welded barrel and the upper receiver assembly, and the addition of the automatic sear assembly and the retaining pin from Government Exhibit 8, that the altered item would shoot automatically more than one shot without manually reloading by a single function of the trigger. This addition of parts [2] took approximately three minutes in open Court.

Government Exhibit 2: This item is a factory deactivated Heckler and Koch G–3, manufactured in West Germany for NATO forces. This particular item was donated to the Association by the manufacturer. Government Exhibit 25, a manual on the Heckler and Koch G–3, describes this generic type as follows: The automatic rifle G–3, caliber 7.62 mm by 5.1 NATO, is a weapon developed in accordance with the most modern production methods. It is used as a semiautomatic or full automatic weapon with or without bipod with fixed or retractable butt stock.

This particular item lacks a serial number and proof marks, which, according to the testimony, indicates that the item was not test fired and not sold for use as a firearm. The evidence was also undisputed that in its

---

**2.** There was a dispute among the experts as to the availability of these parts. Mr. Owen testified they were available commercially. Col. Crossman testified they were available only from military sources. Because of the latter's more extensive experience in this field, I accept his opinion.

present condition, Government Exhibit 2, the Heckler and Koch G–3, cannot be fired either automatically or semiautomatically or otherwise because it has a plugged barrel and missing parts. Expert testimony was to the effect that if the plugged barrel were replaced with an operational barrel from another Heckler and Koch G–3, or an HK 91 sporter,[3] it would be operational. It was brought out on cross–examination that Heckler and Koch G–3 barrels are not available in this country. However, a Heckler and Koch G–3 automatic rifle of similar type might be imported and its barrel and parts missing from Government Exhibit 2 installed in Government Exhibit 2. If this were done, the item would be operational. In short, if an operational Heckler and Koch G–3 automatic rifle were imported and its operational parts transferred to Government Exhibit 2, one would have a single operational Heckler and Koch G–3. Testimony of the experts varied considerably as to difficulties one might encounter in replacing the barrel of a Heckler and Koch G–3. Specialized equipment not available in this country would be required, particularly to effectuate conversion to automatic fire.

Government Exhibit 3: This is a Springfield Armory item, T–44–E4. It was donated by the U.S. Army's Springfield Armory to the Association's Museum following correspondence with the Office of Chief of Ordnance, Department of Army. It is an experimental model only about 500 of which were produced and was a developmental step in the production of the M–14 rifle, now the standard U.S. Army rifle. It is a very rare and much sought after item by museums. Neither the Smithsonian Firearms collection nor the Bureau's own collection contains such an item. The testimony indicated that after extensive field testing by the Army under combat conditions, most of these 500 T–44–E4 models were shot out, destroyed or cut apart for experimental metallurgical testing. Since this factory

demilitarized item is one of the few remaining T–44–E4's from which the current Army M–14 was developed, it is a particularly important item from a technological point of view. It was developed and tested by the United States Army following World War II as a replacement for the M–1 Garand rifle. The T–44 series and the T–44–E4 are similar in basic design of the type fire.

The basic manual for the M–14 FM 23–8, Government Exhibit 30, reads as follows: "The M–14 rifle is a 7.62 mm magazine fed, gas operated, air cooled, semiautomatic shoulder–type weapon. The M–14 is designed primarily for semiautomatic fire but can be converted to automatic fire by installing a selector." An article appearing in the *American Rifleman*, June 1957, entitled "New Service Rifle," Government Exhibit 29, contains the following: "The new U.S. Army rifle M–14 was known as T44 during development. It fires a 7.62 mm NATO cartridge and weighs 8.7 pounds unloaded against 9.6 pounds for the M–1 (Garand) . . . magazine capacity is 20 rounds instead of 8 in the M–1, a change lever "A" gives choice between semi and full automatic fire." Expert testimony revealed that the M–14 and its predecessors, the T–44 and the T–44–E4, may be equipped with a change lever which allows the weapon to be fired semi or full automatic. They also may be equipped in such a manner as to prevent it from firing full automatic.

In its present condition Government Exhibit 3, the Springfield Army rifle T–44–E4, cannot be fired automatically or semiautomatically or otherwise because it has a plugged barrel and is missing certain essential parts. Expert testimony revealed that the plugged barrel of Exhibit 3 can be replaced and that missing parts in Government Exhibit 3 can also be replaced. The standard military M–14 rifle can be the source of these parts as well as commercial parts dealers. Some expert testimony re-

---

**3.** Even if the barrel from an HK 91 sporter could be fitted into the Heckler and Koch G–3, this operation would not make the Heckler and Koch G–3 an operable machinegun. The HK 91 sporter is a lighter semiautomatic. It does not contain the parts essential to automatic fire by Government Exhibit 2.

vealed, however, that replacing the plugged barrel of Government Exhibit 3 with a standard M–14 rifle barrel might involve a head space and alignment problem. This problem has safety aspects and the adjustment may be time consuming. The Government's expert disagreed with expert testimony adduced on behalf of the Association.

Government Exhibit 4: This item is a Harrington and Richardson Model T–48, the Americanized version of the Belgian FN/FAL selective fire rifle, the original of which was manufactured by Fabrique Nationale of Belgium. Expert testimony revealed that the Harrington and Richardson T–48 series was in competition with the T–44 rifle series to replace the U.S. Army M–1 Garand in the 1950's. The Association's *American Riflemen*, Government Exhibit 29, contained an article entitled "New Service Rifle" in the June 1957 issue. This article described the design of the T–48 as follows: "The T–48 final form of the contending rifles submitted by Fabrique Nationale of Belgium and adopted by several nations . . . provision for semiautomatic and full automatic fire and flash hider are like those of the M–14 rifle." Mr. Owen, the Government's expert, testified that he had installed FN/FAL parts in a T–48 and then fired that T–48 fully automatic. His testimony further indicated that this operation could be accomplished probably in less than four hours.* A defense exhibit, NN, contains the following: The T–48 can be fired automatically when fitted with a change lever of the same design as the lever that is standard equipment with the T–48 E–1. It is noted, however, that the T–48 E–1 has a somewhat heavier barrel, a bipod and a hinge butt plate and an automatic change lever.

In its present condition Government Exhibit 4, the Harrington and Richardson item, Model T–48, cannot be fired either automatically or semiautomatically or otherwise because it has missing certain essential parts and has a pin welded to the side

of the receiver which prevents the selector lever from rotating to the "A" (automatic) position. There is dispute whether Government Exhibit 4 can be converted to fire automatically if missing and altered parts are replaced. Also a piece of weld would have to be removed from the receiver of Government Exhibit 4. This could be done with a small "dremel" tool or hand–held power grinder. The necessary parts to convert Government Exhibit 4 to automatic fire could be obtained from a Belgian FN/FAL rifle or another T–48 or T–48 E–1 rifle. There was some expert testimonial dispute on this, however.

The U.S. Army's special text on the T–48 points out the difference between the T–48 which was designed for semiautomatic fire and the T–48 E–1 which was designed for automatic fire as well as semiautomatic fire. The T–48 has a lighter barrel and according to its original designer, Fabrique Nationale of Belgium, is for *semiautomatic firing only*. The Court accepts the testimony of the Association's expert, Col. Crossman, to this effect. The selector lever rotated to only two of the three positions, F & S. A pin in the side of the receiver which was installed at the factory prevented motion of the selector lever to the "A" or automatic position. The selector lever itself was manufactured with a protruding shoulder which struck against the pin in the receiver and limited the motion of the selector lever. Government Exhibit 4 does not have the essential bolt which carries the firing pin, the extractor, and the ejector. The lower left rear corner of the bolt carrier has been ground down to prevent automatic fire. Government Exhibit 4 cannot be fired and is inoperable in its present condition. Government Exhibit 4 would not give automatic fire even if all the missing parts were present. In its present condition it was donated to the Association's museum by the U.S. Army Ordnance Corps.

Government Exhibit 5: This item is a Lee Enfield, .303 caliber, with a barrel length of

* No one as knowledgeable as Mr. Owen would steal this item from the Museum knowing just where to find FN/FAL replacement parts for the presently unserviceable parts. Under these circumstances, replacing the parts would take much longer than four hours.

8⅞ inches. In its present condition it cannot be fired and is inoperable. It is registered in the National Firearms and Transfer Record as an "unserviceable firearm." There is no issue in this case regarding the restorability of the Lee Enfield. Government Exhibit 5 has no sights and no provision for sights. It also has no forestock. The trigger magazine and magazine are completely exposed. In short, it is a cutaway item the sole purpose and use of which is to demonstrate visually the inside mechanism of the item. The receiver has a slot cut in the left side approximately one inch in length. The chamber has been welded closed. The depth of the plug in the barrel is approximately one–half inch and the barrel itself is welded to the receiver ring. Government Exhibit 5 cannot be fired and is inoperable in its present condition. It cannot be readily converted to fire a fixed cartridge. The evidence presented to the Court is that this item was designed and manufactured as a display or demonstration piece, and not as a firearm.

Government Exhibits 6 and 7: These items are called "gyrojet pistols." Both pistols have barrels which have a bore in excess of one–half inch in diameter. Both gyrojet pistols were originally designed to fire a small rocket projectile. In operation, the rocket assembly was placed in the receiver of the pistol on the top of a spring loaded magazine. The hammer of the pistol is rotated rearward, unlike the hammer on a conventional modern pistol. The protruding surface on the face of the hammer struck the projectile on the nose driving the projectile rearward where the primer struck a firing pin on the rear of the receiver. This action ignited the rocket and the projectile moved forward causing the hammer to rotate downward about its pivot where it could be caught by the trigger mechanism. Unlike conventional pistols, the gyrojets have no chamber to withstand the pressure of powder gas during firing. These items represent a new technology and as such are appropriate museum display pieces. They were manufactured in limited quantities as collectors' items.

The rocket projectile itself contained the pressure. Neither of the gyrojets is capable of firing a conventional cartridge. No gyrojet projectiles have been manufactured in recent years. No live gyrojet projectiles were found at the Museum when the gyrojets were seized by agents of the Bureau. At the time of seizure, both gyrojets were displayed free standing with a dummy nickel–plated gyrojet projectile which was not seized by Bureau Agents. Government Exhibit 6, gyrojet pistol numbered A029, when seized from the Association Museum, had no hammer, no firing pin, no sear, and none of the associated springs. It had a trigger but the trigger had no spring on it and was not connected to any other internal part. Government Exhibit 6 is not operable in its present condition. In its present condition it cannot fire a gyrojet projectile.

Government Exhibit 7, gyrojet pistol, numbered A048, when seized, had no sear, sear spring, trigger spring, hammer spring, firing pin, and none of the associated springs. It had a hammer but the protruding face on the hammer had been altered since manufacture to prevent the hammer from striking a gyrojet cartridge. Even if all other parts were present and special gyrojet ammunition available, Government Exhibit 7 gyrojet pistol numbered A048 could not be fired because of the alteration to the hammer. Government Exhibit 7, gyrojet pistol numbered A048, is not operable in its present condition. It cannot fire a gyrojet projectile.

The gyrojet pistol is approximately the same size as a military .45 caliber pistol. The barrel length is approximately five inches, the weight is approximately sixteen ounces, its overall length is 9½ inches. It is capable of being concealed. Gyrojet pistols have not been manufactured in recent years. Prior to the passage of the National Firearms Act of 1968, the Bureau did not consider gyrojet pistols to be covered by the provisions of the prior Act; thus registration was not required at that time. After the passage of the 1968 Act, the "destructive device" category was added. Officially the Bureau took the position that gyrojet pistols were covered by the provisions of

the Act. A newer model gyrojet pistol with a slightly smaller rifled bore was not covered by the definitions of "destructive device" and "any other weapon," thus clearly removing the newer pistols from inclusion within the provisions of the Act. No showing was made respecting the interchangeability of parts. Evidence was received from the Association that subsequent to the passage of the 1968 Act, one Timothy Dale Bixler attempted to register a gyrojet pistol identical to Government Exhibits 6 and 7, and was advised by the Bureau representative that registration was not required. *See* Defendants' Exhibit Q.

## II.

*The Statutory Scheme.*

The National Firearms Act of 1968, 26 U.S.C. § 5801 *et seq.*, is concerned primarily with the taxation, manufacture, dealing in, transfer, and registration of firearms. Registration provisions were redrawn in the 1968 Act to avoid the result reached by the Supreme Court in *Haynes v. United States*, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968). This required revision of prior registration procedures to avoid Fifth Amendment violations. Accordingly, the transferor of a firearm was given primary responsibility to register the firearm and to get authority from the Bureau to transfer it to the transferee. A generally inclusive definition of firearms is established. Sporting rifles and shotguns are exempted. (26 U.S.C. § 5845(f)). Congress focused on sawed–off shotguns and sawed–off rifles, machine guns and destructive devices. Antique firearms are also excluded. In addition, the Secretary is given authority to exclude certain devices which are not likely to be used as weapons or which the owner intends to use solely for sporting purposes.

26 U.S.C. § 5845 provides eight definitions of "firearm", each of which contains specific coverage criteria. Moreover, in order for a device to constitute a "firearm" under § 5845, it must be designed as a weapon. This is a common thread running throughout each of the definitions contained in § 5845. A device that otherwise appears to fall within one of the eight definitions of "firearm" may, in some cases, simply not be designed as a weapon. It may, for instance, be specifically designed by the manufacturer to serve as a museum display piece or military demonstration item.

Of particular relevance to this forfeiture action are the following definitions: "Firearm" means "(1) a shotgun having a barrel or barrels less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; (3) a rifle having a barrel or barrels less than 16 inches in length; (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length; (5) any other weapon, as defined in subsection (e); (6) a machinegun; (7) a muffler or a silencer for any firearm . . . ; and (8) a destructive device." 26 U.S.C. § 5845(a). Antique weapons are excluded from coverage and the Secretary may also exclude collector's items not likely to be used as a weapon. *Id.*

Subsection (b) defines "machinegun" as follows: ". . . any weapon which *shoots*, is *designed to shoot, or can be readily restored* to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any combination of parts designed and intended for use in converting a weapon into a machinegun, *and* any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." 26 U.S.C. § 5845(b) (emphasis added). Subsection (b) is of particular importance in this case since the Government contends that four of the seized items are machineguns. None of these four items shoots. Each of these four items was designed and manufactured not to shoot.

What the Government sought to show was that its experts believe that Government Exhibit 1, the Colt item, Exhibit 2,

the Heckler and Koch item, Exhibit 3, the Springfield item, and Exhibit 4, the Harrington and Richardson item, can *readily be restored to shoot* automatically more than one shot by a single pull of the trigger. There was considerable difference of opinion among the experts as to whether these four items could be readily restored to shoot. That issue will be further discussed in a subsequent section. Each of the four items had either a welded barrel or a plugged barrel and there were essential parts missing. None of the experts concluded that the weld or plug could readily be removed from the barrel in question. The Government's experts testified that replacement barrels were available. Only in the case of Government Exhibit 3, the Springfield item, did the Government make a somewhat plausible demonstration of its position. Both the Colt item, Government Exhibit 1, and the Harrington and Richardson item, Government Exhibit 4, are rare experimental items. Replacement parts and barrels are not readily available and no satisfactory evidence of availability was offered. If one had a completely operational Colt AR-15, why would he wish to substitute its parts into such an item as Government 1. A suitable barrel and replacement parts for the Heckler and Koch item, Government Exhibit 2, are not available in this country. Also of significance is the absence of any testimony that any conversion or replacement parts were found in the Association's museum.

The definition section, § 5845, also contains subsection (e) "Any other weapon," and subsection (f), "Destructive device." The government contends that these sections cover the gyrojet pistols, Government Exhibits 6 and 7. Subsection (e) reads as follows:

The term "any other weapon" means any weapon or device capable of being concealed on the person from which a shot can be discharged through the energy of an explosive, a pistol or revolver having a barrel with a smooth bore designed or redesigned to fire a fixed shotgun shell, weapons with combination shotgun and rifle barrels 12 inches or more, less than 18 inches in length, from which only a single discharge can be made from either barrel without manual reloading, and shall include any such weapon which may be readily restored to fire. Such term shall not include a pistol or revolver having a rifled bore, or rifled bores, or weapons designed, made or intended to be fired from the shoulder and not capable of firing fixed ammunition.

26 U.S.C. § 5845(e). Essential to the applicability of this subsection to the gyrojet pistols is a showing that these pistols can discharge a shot or that they can be readily restored to fire a shot. The evidence is undisputed that in their present condition neither gyrojet can discharge a shot. Whether either can be readily restored to fire will be discussed in a subsequent section.

■ Subsection (f) reads in pertinent part as follows:

The term "destructive device" means (1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellant [4] charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device; (2) any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant,[4] the barrel or barrels of which have a bore of more than one-half inch in diameter, except a shotgun or shotgun shell which the Secretary finds is generally recognized as particularly suitable for sporting purposes; and (3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled.

26 U.S.C. § 5845(f). This definition is in three basic parts. Only subpart (D) of subparagraph (1) is potentially applicable to

---

4. May be spelled propellent or propellant according to Webster.

the gyrojet pistols insofar as this first category is concerned. The ammunition for a gyrojet pistol could be deemed to be a missile but since no gyrojet ammunition was found in the Association's museum, the gyrojet pistols cannot qualify under subparagraph (1). Subparagraph (2) is alleged to be applicable to the pistols. Again, in their present condition, there is no dispute in the evidence that the pistols will not expel a projectile. Whether they can be "readily converted" to expel a projectile will be discussed in a subsequent section. Subparagraph (3) contemplates any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2). There are essential ingredients missing here also: the "missile" specified in subparagraph (1), the projectile specified in subparagraph (2), and the explosive or other propellant specified under either subparagraph (1) or (2). Without these ingredients, the parts seized from the Association's museum do not constitute a "destructive device" as defined in subparagraph (3) of the statute.[5]

*Readily Restored to Shoot.*

■ If Government Exhibits 1 through 4 were not designed or manufactured to shoot, or cannot be readily restored to shoot, automatically, they are not firearms within the coverage of the Act. These words are not defined in the Act. Accordingly, the Court will apply the normal and usual meaning attributed to these words.[6] "Readily," according to Webster, means: without hesitation; without delay; quickly;

without difficulty. While the testimony of the experts was in conflict as to how quickly or how difficult the operation might be to convert these items to a condition whereby they might be fired, the Court believes that the testimony offered by the Association has the more convincing force.[7] Government Exhibits 1 through 4 were designed and manufactured *not* to shoot. The barrels were welded and other incidental welds were placed in the items to prevent firing, either automatically, semiautomatically or otherwise. The experts were in agreement that to drill out these welds or barrel plugs would be both time consuming and impractical. Also it would damage or destroy the barrel. The experts agreed that if this procedure were elected, a shop in which the tools would cost approximately $65,000 would be required and expert gunsmith services would be necessary. This, it seems to the Court, clearly is not within the coverage reasonably anticipated by the key word "readily."

The Government sought to get around this obstacle by demonstrating through its expert that a barrel and receiver from an operable firearm, as well as other operable parts, might be substituted. In order to make the demonstration with respect to Government Exhibit 1, the Colt item, Mr. Owen removed the barrel and upper receiver as well as operable parts from Government Exhibit 8, which had been taken from the Bureau's museum and substituted these operable parts in Government Exhibit 1, the seized Colt item. Since this experimental item is a rare piece, it is highly unlikely

---

5. In *United States v. Malone*, 546 F.2d 1182 (5th Cir. 1977), the Fifth Circuit had occasion to reverse a conviction for possession of an unregistered firearm. The unregistered firearm was alleged to be a "destructive device" as defined by section 5845(f)(3) of Title 26, United States Code. The description of the device was that of a military MK2 fragmentation hand grenade. However, at no time did defendant have in his possession nor did the indictment charge possession of any explosive. The Fifth Circuit held: "What we do hold is that the complete absence of explosive material would prevent the component parts in defendant's possession from being a destructive device." 546 F.2d at 1184.

6. *E. g., United States v. New Mexico*, 536 F.2d 1324, 1327–1328 (10th Cir. 1976); *see* 2A C. Sands, Sutherland on Statutes and Statutory Construction §§ 45.08, 47.28 (4th ed. 1973).

7. Col. Edward Crossman, a career Ordnance Corps officer in the U.S. Army specializing in the development of small arms, testified on behalf of the Association. He is the author of numerous articles in this field and after his retirement was selected as the consultant for a congressional committee investigating complaints concerning some of the items in this case. Exhibit JJ.

that one seeking to convert Government Exhibit 1 might have access to an operable barrel upper receiver and spare parts of a Colt AR–15.[8] Accordingly, the Court is not satisfied that the Government has made the required demonstration that the Colt item is a firearm or that it is readily convertible to be a firearm.

The term which Congress saw fit to use in the statute, "restorable", is defined by Webster "to bring back to a former or normal condition, as by repairing, rebuilding, altering, as to restore a building, painting, etc." It is obvious that when one is concerned with Government Exhibit 1, which was never in the first place designed to shoot but was on the other hand designed to be a museum display piece and shipped by Colt to the Association's museum for that purpose, one is not seeking to restore the item. One is seeking to demonstrate that the item can be converted into something this item was never designed to be in the first place. This is also true in the case of Government Exhibits 2, 3, 4, and 5.

With respect to the Heckler and Koch item, Government Exhibit 2, as previously pointed out, the manufacturer in West Germany shipped through customs an item designed and manufactured as a display piece. The manufacturer welded the barrel; Exhibit 2 has missing certain essential parts; it has never been fired; it was designed and manufactured solely as an exhibition piece for the Association's museum. No operable barrels are available in this country nor are the missing essential parts available. The Government's proof accordingly fails. The item was not designed or manufactured to shoot nor is it readily convertible to shoot, either automatically, semiautomatically or otherwise.

Government Exhibit 3, the Springfield T–44–E–4, is a transitional model of what subsequently has been developed into the M–14. As previously pointed out, this developmental model is a rare piece of interest primarily to a museum. There was conflict between the expert witnesses as to the substitution of a barrel from an M–14 re-specting this item. The Government's expert saw no problem but the Association's expert pointed out the head space problem and others that might be encountered. Originally the Springfield Armory model T–44–E–4 was designed as a lightweight, air cooled, gas operated, magazine fed, shoulder weapon, designed primarily for semiautomatic fire. To fire automatically it must be converted. In its present condition Government Exhibit 3 is inoperable. Removing the obstruction from the barrel would require a barrel vise and certain expensive milling equipment not readily available even in a fully equipped gunsmith shop. The cost of a milling machine is about $2,000. Witnesses agreed that the removal of a barrel obstruction requires the skill and experience of an expert gunsmith. The removal of the barrel from a T–44–E–4 item requires a barrel vise and an action wrench, as well as the services of an expert gunsmith. There was no testimony at trial which indicated a source from which a T–44–E–4 barrel might be obtained. Even if an M–14 barrel might be obtained, no satisfactory showing was made that an M–14 barrel would thread into a T–44–E–4 receiver. Even if this could be done, a head space problem is likely to be encountered. A master gunsmith might check for the head space problem. If this were not corrected within the specified tolerances, the item might blow up and injure the shooter.

A master gunsmith working in a fully equipped shop with tools and equipment costing over $65,000 would require more than four hours to replace the barrel of the T–44–E–4 or attempt to salvage the existing barrel if no unforeseen problems were encountered. If the gunsmith sought to remove the obstruction and salvage the existing barrel, this salvage attempt might destroy the barrel. Obviously the rifling would be ruined, thereby destroying the accuracy of the item. Government Exhibit 3 cannot readily be converted to shoot automatically more than one shot without manual reloading by a single function of the

---

8. *See* note 2 *supra.*

trigger. It was not designed to shoot automatically. Even if Government Exhibit 3, the Springfield Armory item T–44–E–4, were originally designed to render fully automatic fire, it was redesigned by the designer–manufacturer so that it presently is not designed to shoot automatically more than one shot without manual reloading by a single function of the trigger. In its present condition Government Exhibit 3 is not capable of firing automatically, semiautomatically or otherwise. It is designed and manufactured as a museum piece and not a firearm.

The Harrington and Richardson item, Government Exhibit 4, also is a rare experimental item donated to the Association's museum by the Ordnance Corps of the United States Army, by which it was completely demilitarized and redesigned as a museum piece. The Harrington and Richardson T–48 represents a developmental phase in which competing efforts were being made to replace the M–1 Garand rifle by an Americanized version of the Belgian–NATO rifle. Replacement of the barrel and missing parts was the subject of sharp conflict between the experts. The Court accepts the testimony of the Association's expert as the more logical and convincing for reasons previously set forth. When this item left the factory, it was not designed to shoot automatically more than one shot without manual reloading by a single function of the trigger. Expert testimony, which the Court accepts, was to the effect that an expert gunsmith working in a fully equipped gun shop with tools and equipment costing approximately $65,000 would require at least 30 hours to plan and achieve the conversion of this item to full automatic fire. In this connection it is noted that the parts of a Fabrique Nationale FN/FAL rifle are not fully interchangeable with the T–48 item and for this reason, the time required for a conversion of this item to one capable of fully automatic fire might take substantially longer than the 30 hours contemplated by the Association's expert. It is

my finding that this Harrington and Richardson item is a museum piece, not a firearm, and that it is not readily convertible to shoot automatically.

▉ The Government contends that, regardless of missing essential parts and the welded or otherwise unserviceable condition of the barrels of Government Exhibits 1, 2, 3, and 4, they are nevertheless machineguns within the purview of 26 U.S.C. § 5845(b) for the reason that the frame or receiver [9] of each is intact and therefore, under the provisions of the second sentence of the definition, the frame or receiver units themselves are machineguns. Section 5845(b) reads as follows:

> Machinegun.–The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any combination of parts designed and intended for use in converting a weapon into a machinegun, *and* any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b) (emphasis added). It is clear that the interchangeable term "frame or receiver" is used in the conjunctive with conversion parts and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person. No evidence was offered with respect to the possession of these parts insofar as the Association is concerned. Since the Congress saw fit to phrase the second sentence of section 5845(b) in the conjunctive and not in the disjunctive, a reasonable reading of the statute would require the conclusion that the term "frame or receiver" is not contemplated in isolation but together with the possession of additional parts from which the machinegun could be assembled.

---

**9.** These terms are interchangeable according to the testimony of Mr. Owen, the Government expert.

The Government relies upon legislative history to demonstrate that Congress did not intend conjunctive use but on the other hand, meant disjunctive use. When the statute is clear and unambiguous on its face, no resort to legislative history is required or even justified.[10] Had Congress intended what the Government now advocates, the simple use of the word "or" instead of "and" in the second sentence would have achieved this result. It is noted that in the preceding sentence where disjunctive meaning was intended "or" was used. The Association, in disputing the Government's interpretation of the second sentence of the definition of machinegun, points out that the "frame or receiver" of the M–1 carbine (semiautomatic) is identical with the frame or receiver of the M–2 carbine (automatic). This testimony, which is undisputed, illustrates the fallacy of the Government's interpretation that "frame or receiver" means a machinegun (automatic).

The Government's contention that the frame or receiver of each of the following items–Government Exhibit 1, the Colt item; Government Exhibit 2, the Heckler and Koch item; Government Exhibit 3, the Springfield item; and Government Exhibit 4, the Harrington and Richardson item–are machineguns ignores the plain meaning of the second sentence of the definition of "machinegun." The Government contends, in short, that the frame or receiver is the machinegun. The language reads as follows: "The term shall also include the frame or receiver of *any such weapon*," which refers back to the first sentence and requires that the frame or receiver be the frame or receiver of any machinegun (1) which shoots, (2) is designed to shoot or (3) can be readily restored to shoot automatically more than one shot without manual reloading by a single function of the trigger. As previously demonstrated with respect to these four items, no one of them

shoots, no one of them is designed to shoot, no one of them can be readily restored to shoot, automatically more than one shot without manual reloading by a single function of the trigger. These four items were designed and manufactured as display pieces, not as firearms, and as such, were donated to the Association's museum by the manufacturer or the United States Army prior to the effective date of the 1968 Act.

■ The Lee Enfield item, Government Exhibit 5, with its cutaway barrel, designed or redesigned to demonstrate the inner mechanism of this item and not at anytime disclosed by the evidence designed to fire, is an item in which the Government's proof is inadequate to justify the conclusion that it is a firearm subject to forfeiture.[11] Government Exhibit 5 is a clear example of an item that was simply not designed as a weapon, but rather was designed as a military demonstration piece. Even if there were merit in the Government's contention that this is an "unserviceable firearm" within the meaning of section 5845(h),[12] it appears from the evidence that the former owner of the item, one Benjamin O. Coppess, did register it and did notify the Bureau that he was transferring it to the Association. The record is unclear as to whether he filled out and filed the papers required by the Bureau to authorize transfer to the Association. However, the Association offered extensive evidence in the form of reports of officials of the Bureau to demonstrate the incompleteness of the Bureau's records. It is my finding that Government Exhibit 5 is a demonstration item or display piece and not a firearm and further that the Government has failed to prove that the item is not registered.

With respect to the gyrojet items, Government Exhibits 6 and 7, a somewhat different situation is presented. Unlike the

---

**10.** *Sea–Land Service, Inc. v. Federal Maritime Commission*, 131 U.S.App.D.C. 246, 350, 404 F.2d 824, 828 (1968); *United States v. Oregon*, 366 U.S. 643, 648, 81 S.Ct. 1278, 1280, 6 L.Ed.2d 575 (1961).

**11.** *See* § 5845(a)(3), (c) ("rifle" definition).

**12.** For the same reasons set forth in the discussion below of Government Exhibits 6 and 7, Government Exhibit 5 cannot be classified as an "unserviceable firearm" because it is not a "firearm".

other items, they were originally designed and manufactured to fire. But design is not the specified factor here. Sections 5845(e) and (f), on which the Bureau relies, refer respectively to devices from which a shot can be discharged or which may be readily restored to fire, § 5845(e), and any type of weapon which will or which may be readily converted to expel a projectile, § 5845(f).

■ There is no question but that when seized neither gyrojet item was operable. They could not discharge a shot or expel a projectile. The next question is whether either item can be "readily restored to fire" within the meaning of subsection (e), or "readily converted to expel a projectile," within the meaning of subsection (f). Replacement of the missing essential parts would require a master gunsmith working in a gun shop, the equipment and tools costing $65,000–13¾ hours in the case of gyrojet pistol A–029 (Government Exhibit 6) and 12 hours in the case of gyrojet pistol A–048 (Government Exhibit 7)–to fabricate the essential parts now missing. This is *not* readily restorable to shoot or readily convertible to expel a projectile. *See, e. g., United States v. 16,179 Molso Italian .22 Caliber Winlee Derringer Convertible Starter Guns*, 314 F.Supp. 179 (E.D.N.Y.1970), *aff'd*, 443 F.2d 463 (2d Cir.), 404 U.S. 983, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971) (less than 15 minutes held readily convertible). Moreover, this is clearly the fact since no gyrojet ammunition is available for these pieces. There is no known source from which gyrojet ammunition can be obtained for these items. The special ammunition required for a gyrojet pistol and without which it cannot be considered a weapon has not been manufactured for some years and none of the expert witnesses who testified knew where it could be procured. The Court concludes therefore, on the evidence presented, that Government Exhibits 6 and 7 cannot be readily restored to fire and cannot be readily converted to expel a projectile by the action of an explosive.

■ The Government further contends that even if these items are unserviceable or incapable of being readily restored to a firing condition, they are nevertheless still firearms which are required to be registered under section 5845(h). The Government's reliance upon subsection (h), the "unserviceable firearm" provision, with respect to these gyrojets is misplaced. In determining whether the provisions of section 5845(h) are applicable, one must refer back to the definition of "firearm." Since the gyrojet pistols do not qualify either as a "destructive device" or as "any other weapon," and do not qualify under any other definition, they are not "firearms" within the meaning of § 5845(a). As a result, the "unserviceable firearm" definition, which merely serves to carve out a transfer tax exemption for devices that otherwise constitute firearms,[13] is inapplicable.

As previously pointed out, when one Timothy Dale Bixler sought to register an identical gyrojet pistol following the passage of the 1968 Act, he was told by a representative of the Bureau that registration was not required. If Mr. Bixler's gyrojet was identical to these gyrojets, he was correctly informed.

*Forfeiture.*

This is a highly unusual action. As far as this Court has been able to ascertain, this is the only instance in which the Government has seized items from a recognized museum. Practically all of the cases involve various violations or alleged violations of Title 26, section 5801 *et seq.* and its predecessor act. In many instances criminal cases were prosecuted. Here, the forfeiture which the Government seeks to impose rests solely on the proposition that the Government has no record of the registration of the items seized.

■ The Court concludes that there is a failure of proof so far as the Government is concerned which would justify the forfeiture of these items. Five of the seven items were completely demilitarized or rendered incapable of firing by the manufac-

**13.** *See* 26 U.S.C. § 5852(e).

turer or the United States Government prior to being donated to the Association's museum. In most instances, so far as the evidence shows, the items have never been fired, were not designed or manufactured to fire, and hence are not firearms. The two gyrojet pistols are not destructive devices as that term is defined in the Act. Registration is the responsibility of the transferor. Considerable evidence was received that the Bureau's officials have for many years recognized the inadequacy and incompleteness of the Bureau's records. The Court is not required to pass judgment on this, however, because the Government has failed to show that these seven items are firearms.

In *McKeehan v. United States*, 438 F.2d 739 (6th Cir. 1971), the Sixth Circuit emphasized that appellant was a law-abiding citizen who had placed his firearms in a collection with the continuing lawful purpose of maintaining valuable souvenirs or curios from his wartime service. Appellant had lawfully brought these souvenirs into this country and had held them for more than twenty years before seeking to register them, at which time he found himself under indictment and the subject of a forfeiture proceeding. The criminal charges were subsequently dismissed by the Government. The court pointed out that this forfeiture action was not a typical *in rem* proceeding. The lack of any valid legislative, administrative or revenue purpose afforded the court a basis for conceiving of the action for certain constitutional purposes as an *in personam* action. The court pointed out that it was not creating a legal fiction but destroying one. That legal fiction is that the items themselves have violated the law. Among other things, the court emphasized the lawfulness of appellant's interest in possessing the firearms, the lack of any declared legislative policy that forfeiture under those circumstances would aid in enforcing criminal laws and the lack of any sound administrative or revenue purpose to justify the forfeiture. The instant case has much in common with the *McKeehan* case.

■ The Court is clear that the Government's proof has failed to establish that the seized items are firearms as that term is defined in the statute for the reasons previously set forth. Furthermore, it notes that discretionary authority is conferred upon the Secretary to exempt certain firearms as collector's items or curios when they are not likely to be used as a weapon. By conferring authority on the Secretary to exempt certain devices that are primarily collector's items even though they were originally designed as weapons, section 5845(a) clearly contemplates that a given device may or may not be "designed as a weapon." It thus adds further support to the Court's conclusion that items such as Government Exhibits 1 through 5, which are primarily collector's items or museum pieces but which were not even designed as weapons, are not firearms within the meaning of the Act.

The Tenth Circuit in the recent case of *Davis v. Erdmann*, 607 F.2d 917 (10th Cir. 1979), had occasion to discuss the Secretary's discretionary authority under § 5845(a). Plaintiff filed application to import from England a device or weapon described as a "knife–pistol." The application was denied by the Director of the Bureau of Alcohol, Tobacco and Firearms. Thereafter there was a hearing by agreement before the Court magistrate, who found that the Director's action was arbitrary and capricious. The District Court sustained the Director's objections to the Magistrate's holding. The plaintiff appealed and the Court of Appeals reversed the District Court. The Court of Appeals discussed the purpose of the National Firearms Act and the Gun Control Act and stated that each of these acts in somewhat different language recognized the interest of citizens in antique and unusual firearms and concluded that it was not the purpose of Congress "to place any undue or unnecessary Federal restrictions or burdens on law–abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trap–shooting, target shooting, personal protection, or any other lawful activity . . . ." 607 F.2d at 918. The Court

then said "the issue is not whether the knife–pistol could be used as a weapon but whether it is 'primarily a collector's item and not likely to be used as a weapon,' or is 'a curio or museum piece.'" The Court concluded that the knife–pistol was within either definition. The Court further concluded that the Director's denial of a permit appeared to be a classic example of agency "nitpicking" and was arbitrary and capricious. *Id.* at 920. In the instant case, the items are not even designed and manufactured as weapons.

Statutes imposing a forfeiture must be strictly construed.[14] The basis or justification for the imposition of a forfeiture is that the articles sought to be forfeited are guilty or are somehow involved in the commission of a crime.[15] Generally, forfeiture statutes are strictly construed against forfeiture and in favor of the person whose property rights are affected. Every element justifying the forfeiture must be clearly shown and the rules of procedure are to be construed so as to narrowly circumscribe the remedy of forfeiture.[16] Unless the property is used in violation of law, there is no justification for the forfeiture.

In this case, the right of the Bureau to check the contents of the Museum is not challenged. What must be strictly construed, however, is the justification for the seizure and the forfeiture. The Bureau seeks to accomplish this by attempting to show that Exhibits 1–4 are machineguns which shoot, are designed to shoot, or may be readily restored to shoot automatically. It is this statutory definition that must be strictly proven. The Bureau's proof has failed to show clearly that Exhibits 1–4 are machineguns as defined by the statute. They do not shoot; they were not designed by the manufacturer to shoot; and they may not be readily restored to shoot automatically more than one shot by a single function of the trigger.

Since the Government has not shown that Exhibits 1–4 are firearms (machineguns), they are not subject to the requirement of registration. No loss of revenue is involved. Failure to register is the only violation of law on which the Government depends in its effort to justify seizure and forfeiture. Its effort must fail.

Exhibit 5, the short barrel Lee Enfield item, was not designed or redesigned or made or remade and intended to be fired from the shoulder nor may it be readily restored to fire a fixed cartridge. The proof showed that it was designed as a demonstration piece with a cutaway section of the receiver, the function of which was to illustrate the inner mechanism of the piece. It is not a firearm. The prior owner did register it as an inoperable firearm and did notify the Bureau of its transfer to the Association. The record is unclear as to further action. The record does not justify the seizure and forfeiture of this item.

Government Exhibits 6 and 7, the gyrojet pistols, have not been shown to be destructive devices or any other weapons as the Government contends. Accordingly, they are not firearms requiring registration.

## CONCLUSION

On the basis of the findings of fact and conclusions of law set forth above, the Court concludes that judgment should be entered in favor of defendants and against plaintiff and that each of the seized items should be returned to the Association's museum.

---

14. *American Maritime Ass'n. v. Blumenthal*, 590 F.2d 1156, 1165 (D.C.Cir.1978), *cert. denied*, 441 U.S. 943, 99 S.Ct. 2161, 60 L.Ed.2d 1045 (1979).

15. *United States v. U.S. Coin & Currency*, 401 U.S. 715, 719, 91 S.Ct. 1041, 1043, 28 L.Ed.2d 434 (1971).

16. *E. g., Lowther v. United States*, 480 F.2d 1031, 1034 (10th Cir. 1973); *United States v. Goodson*, 439 F.2d 1056 (5th Cir. 1971); *United States v. 1954 Oldsmobile*, 132 F.Supp. 688 (W.D.Ky.1955); *Kane v. McDaniel*, 407 F.Supp. 1239, 1242 (W.D.Ky.1975).