UNITED STATES of America, Plaintiff,

v.

Ora A. BRADY, Defendant.

Crim. A. No. 88–CR–321.

United States District Court, D. Colorado.

April 6, 1989.

Joseph Mackey, Asst. U.S. Atty., Denver, for plaintiff.

Sheldon Emeson, Denver, for defendant.

## MEMORANDUM OPINION
## AND ORDER

MATSCH, Judge.

The defendant is charged with two firearms violations. Count I charges posses-sion of an unregistered firearm under 26 U.S.C. § 5861(d) and 26 U.S.C. § 5871. Count II charges possession of a firearm by a convicted felon in violation of 18 U.S. C. § 922(g)(1). Trial was held to the court after a waiver of jury.

### FINDINGS OF FACT

The defendant, Ora A. Brady (Brady), is a 61–year–old tree trimmer and concrete worker who traps animals in the winter when the weather makes working his other jobs impossible. Brady has lived in Baca County, Colorado for the past 40 years. On December 28, 1987, Brady was found in possession of a number of "coyote getters" which he had set out as animal traps.

A coyote getter is a device used to kill coyotes by propelling cyanide into their mouths when they pull on the bait. A hollow tube of light metal, crimped at one end, holds a spring-loaded firing pin assembly which is cocked and held by a cross pin. Above it is a shell holder, slightly longer than an empty .38 caliber shell casing. The shell holder is made of soft metal. The coyote getter is designed for use with a special .38 caliber shell that consists of a normal .38 shell casing having only a primer, or a primer and a negligible quantity of gunpowder. The cartridge fires a plastic capsule filled with cyanide. The device is buried in the ground with just the shell holder above the surface. The shell holder is baited, animals are attracted to the bait and bite it, tripping the firing mechanism, which in turn explodes the primer and kills the animal by propelling the cyanide into the animal's mouth. · Given that the shell holder is made of light, soft metal, it is obvious that the shell holder was not de-signed to contain the explosion of a normal round of ammunition, but rather, was in-tended to keep the cyanide cartridge in place, and hold the bait.

The coyote getters possessed by Brady were not registered as firearms in the Na-tional Firearm Registration and Transfer Record of the Treasury Department.

Brady pleaded guilty to an unrelated state offense in the District Court for Baca County in 1987 and was put on probation

for two years. He was told he could possess a firearm in connection with his work. In September, 1988, permission to possess a weapon was revoked by the court because it was learned that possession might be in violation of federal law. A hearing on the issue was held on October 3, 1988. After some discussion, Judge Norman Arends concluded that "Mr. Brady can utilize a firearm specifically for hunting and trapping within the confines of his occupation." The judge was aware of 18 U.S.C. § 922. Colorado law required that the judge inform himself about Brady's prior record before putting him on probation. See Colo. Rev.Stat. § 16–11–102 (requiring investigation of past criminal record upon a plea of guilty); cf. Colo.Rev.Stat. § 16–11–203(1)(d) (prior record is factor in probation determination). The judge's statement was incorrect because Brady had two prior felony convictions.

When he was arrested by Alcohol, Tobacco and Firearms (ATF) agents on November 29, 1988, Brady had a loaded .22 caliber revolver in a holster on his person. Brady was standing by a pickup truck which had a dead bobcat in the back. Brady's possession of the revolver was for the purpose of pursuing his trapping vocation. Brady shot the bobcat shortly before the arrest.

Richard Craze (Craze), a firearms enforcement officer for the ATF, tested one of the coyote getters with a primed shell casing and bullet, but no additional powder. The bullet travelled several feet, and penetrated a piece of cardboard. Craze testified that the device could be used as a handgun. However, he said that he was afraid to test the device with standard ammunition because it would be too dangerous.

Darrell Gretz (Gretz), a wildlife biologist and the Assistant Regional Director of the United States Department of Agriculture, also testified about the nature of the coyote getter. He agreed with Craze that the device would be extremely dangerous to use as a hand-held weapon firing standard ammunition because of the risk of explosion. If normal ammunition were put in a coyote getter, there is a probability that the cartridge would explode, disintegrating the shell holder, and distributing fragments. The shell holder is different from the barrel of a gun. The barrel of a gun contains the force of the exploding powder and gives direction to a bullet. The part of the coyote getter holding the cartridge is only slightly longer than the shell casing itself; therefore it would not effectively contain the gasses to propel the bullet and could not serve to direct the bullet.

## CONCLUSIONS OF LAW

### Count I.

█ The controlling question is whether the government has proved that the coyote getter is a firearm. The definition of firearm in 26 U.S.C. § 5845(a) includes "any other weapon." Any other weapon includes "any weapon or device capable of being concealed on the person from which a shot can be discharged through the energy of an explosive." 26 U.S.C. § 5845(e). The government proposes an absolutely literal interpretation of the law. A coyote getter is concealable. A coyote getter can fire a shot through the energy of an explosive. However, application of the statutory definition without the limitation of common sense would criminalize the possession of a cigarette lighter and a pair of pliers, or a hammer and nail.

Two features of the coyote getter are convincing evidence that this device is not a firearm. First, the device does not materially increase the offensive usefulness of ammunition; that is, a user of the coyote getter does not have a substantially better weapon in the coyote getter than he would have with a cartridge by itself. Second, the device would be so dangerous to the user that only a person bereft of reason would consider using the coyote getter as a firearm.

Further, the testing procedures employed by Craze are an impressive example of actions speaking louder than words. Craze is an experienced firearms expert and testified that this device was a firearm. But while he was willing to test the device with a cartridge consisting only of a primer, and then only of a primer and a bullet

but no powder, even with all the resources and equipment of the ATF's Washington D.C., laboratory available to him, he felt it was too dangerous to his personal safety to test it with an ordinary round of .38 caliber ammunition. Without question many devices that are dangerous to the user are firearms, such as, perhaps, cheaply made "saturday night specials," or starter's pistols altered to accept and fire normal ammunition. But this device is so useless as a weapon, and so likely to cause injury to the user, that it cannot be readily distinguished from the variety of common items that could, as a purely theoretical matter, be used to fire ammunition, but that as a matter of practicality and common sense would never be used for that purpose by a sane person.

Every device that has been found to be any other weapon has been a weapon capable of firing normal ammunition with some likelihood that the projectile would go in the intended direction and not injure the user of the weapon. The Revenue Rulings cited by the government are instructive. In Revenue Ruling 56–47, for instance, a device made of "nickel-chrome plated steel" that was test fired "using .38 caliber, 146 grain wadcutter bullets and was found to perform satisfactorily with no structural damage to the device being incurred" was found to be a firearm. Similarly, in Revenue Ruling 56–597, it was held that a .38 caliber tear gas gun that could fire standard ammunition without structural damage was a firearm, as was a 20 gauge tear gas gun that could fire standard shotgun shells, again without "structural damage to the device evidenced as a result of the test." In *United States v. Decker*, 292 F.2d 89, 90 (6th Cir.), *cert. denied*, 368 U.S. 834, 82 S.Ct. 58, 7 L.Ed.2d 36 (1961) the court held that a tear gas gun that could fire commercial shotgun ammunition without rupturing the barrel or causing damage to the weapon was a firearm. *See also Davis v. Erdmann*, 607 F.2d 917, 919 (10th Cir.1979) (implicitly assuming that a combination knife/pistol that could fire a .22 short cartridge was within the definition of any other weapon); *United States v. Ordner*, 554 F.2d 24, 26 & n. 3 (2d Cir.) (a "pen gun," which it described as a device made from the triggering mechanism of a flare gun attached to a machined barrel, was "any other weapon"), *cert. denied*, 434 U.S. 824, 98 S.Ct. 71, 54 L.Ed.2d 82 (1977); *United States v. Cheramie*, 520 F.2d 325, 333 (5th Cir.1975) (affirming a conviction based on possession of an unregistered pen gun); *Moore v. United States*, 512 F.2d 1255, 1256 (4th Cir.1975) (sawed off shotgun could be any other weapon); *United States v. Coston*, 469 F.2d 1153, 1153 (4th Cir.1972) (a flare gun capable of firing shotgun shells was any other weapon); *cf. United States v. Seven Misc. Firearms*, 503 F.Supp. 565, 579 (D.D.C.1980) (noting that "the items are not even designed and manufactured as weapons" in support of finding non-firing museum pieces were not firearms). Research has found no cases in which a court or administrative agency found that a device which was likely to explode if used with normal ammunition was any other weapon.

This court concludes that the coyote getter is not any other weapon, and so is not included within the definition of a firearm. Brady is acquitted of this Count because the government has failed to prove that he possessed a firearm. Accordingly, his other defenses are not considered.

### Count II.

▇▇▇ Count II charges possession of a firearm by a convicted felon based on Brady's possession of the .22 caliber revolver. Counsel for the government correctly observes that the defenses to this charge are few. Under the law, it is immaterial whether Brady knew he was a convicted felon. *See, e.g., United States v. Williams*, 588 F.2d 92 (4th Cir.1978). It also is no defense that he did not know he was prohibited from possessing a firearm. *See, e.g., United States v. Shomo*, 786 F.2d 981, 985 (10th Cir.1986); *United States v. Laymon*, 621 F.2d 1051, 1054 (10th Cir. 1980); *but see United States v. Rose*, 695 F.2d 1356, 1358 (10th Cir.1982) (upholding conviction for possession of an unregistered firearm under 26 U.S.C. § 5861(d) on the ground that there was sufficient evidence of intent and notice of criminality of

acts), *cert. denied*, 464 U.S. 836, 104 S.Ct. 123, 78 L.Ed.2d 121 (1983). All that the government needed to prove to make a prima facie case was that the defendant possessed a firearm, that the firearm travelled in interstate commerce, and that he had previously been convicted of a crime punishable by a year or more. *See, e.g., United States v. Martin*, 706 F.2d 263 (8th Cir.1983) (decided under prior law).

▮ Brady argues that the fact that a state court judge told him he could possess a firearm in connection with his hunting and trapping precludes his conviction. Since specific intent is not an element of this offense, the fact that Brady may have reasonably believed that he was violating no law is not a defense.

However, this is not a situation where a defendant relied on nothing more than his own research or advice of counsel. Here, a judge with criminal jurisdiction over Brady specifically told him that he could continue to possess a firearm when hunting and trapping. There is a difference between merely acting reasonably and in good faith, and acting under the affirmative advice of a judge. In this case, it would violate due process to convict Brady of this offense in light of the fact that the defendant's conduct conformed to the judge's statement of law.

Two Supreme Court cases illustrate the principle. In *Raley v. Ohio*, 360 U.S. 423, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959) four people were convicted in state courts for refusing to answer questions of a legislative commission. They were told by the legislators that they could refuse to answer the questions because of the state privilege against self-incrimination. This was not in fact the law of Ohio because there was a statute giving the witnesses immunity. Nonetheless, the court held that the witnesses could not be convicted. To permit such a conviction, said the Court, "would be to sanction an indefensible sort of entrapment by the State—convicting a citizen for exercising a privilege which the State had clearly told him was available to him." 360 U.S. at 426, 79 S.Ct. at 1260.

Importantly, the Court did not conclude that the witnesses had been actually entrapped, that is, intentionally misled to entice them to commit a crime. "[T]here is no suggestion that the Commission had any intent to deceive the appellants." 360 U.S. at 438, 79 S.Ct. at 1266. The Court presumed that the violation of law was caused by the erroneous advice of the officials. In deciding to reverse, the Court stated that "[w]e cannot reach a contrary conclusion by [speculating] that some of the appellants might have behaved the same way regardless of what the Commission told them." 360 U.S. at 439, 79 S.Ct. at 1267.

Similarly, in *Cox v. Louisiana*, 379 U.S. 559, 570–71, 85 S.Ct. 476, 483–84, 13 L.Ed. 2d 487 (1965) the Court reversed a conviction for violating a statute that prohibited demonstrations near a courthouse because the picketers had been told by the local police chief that they could lawfully protest across the street from the courthouse. Many other cases underscore the point. *See United States v. Pennsylvania Industrial Chemical Corp.*, 411 U.S. 655, 674, 93 S.Ct. 1804, 1816, 36 L.Ed.2d 567 (1973) ("traditional notions of fairness inherent in our system of criminal justice" prevent the government with proceeding with a prosecution under a statute when the defendant reasonably relied on regulations issued under authority of the statute permitting performance of the charged acts); *United States v. Clegg*, 846 F.2d 1221, 1223 (9th Cir.1988) (good faith reasonable reliance on the apparent authority of government officials is a defense); *United States v. Durrani*, 835 F.2d 410, 422 (2d Cir.1987) (legitimate reliance on an official interpretation of the law is a defense); *United States v. Rosenthal*, 793 F.2d 1214, 1235 (11th Cir.) (legitimate reliance on an official interpretation of the law is a defense), *modified on other grounds*, 801 F.2d 378 (11th Cir.), *cert. denied*, 480 U.S. 919, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987); *United States v. Duggan*, 743 F.2d 59, 83 (2d Cir.1984) (although there are few exceptions to the rule that ignorance of the law is no excuse, there "is an exception for legitimate reliance on official interpretation of the law"); *United States v. Barker*, 546 F.2d

940 (D.C.Cir.1976); *see also Marks v. United States,* 430 U.S. 188, 196, 97 S.Ct. 990, 995, 51 L.Ed.2d 260 (1977) (it would be violative of due process to convict publishers based on an obscenity standard that came into existence after they disseminated their materials, they were entitled to rely on the previous standard); Model Penal Code § 2.04(3)(b) (1985) (reasonable reliance on an official statement of the law by an official responsible for interpretation, administration or enforcement of the law is a defense to criminal conduct).

The case for allowing the due process defense when the advice is given by a judge is even more compelling. Because of the unique role of the judiciary in interpreting the law, many courts have recognized that it "would be an act of 'intolerable injustice' to hold criminally liable a person who had engaged in certain conduct in reasonable reliance on a judicial opinion instructing that such conduct is legal." *Kratz v. Kratz,* 477 F.Supp. 463, 481 (E.D. Pa.1979) (footnotes omitted) (quoting *Wilson v. Goodin,* 163 S.W.2d 309, 313 (Ky. 1942)). *Accord United States v. Albertini,* 830 F.2d 985, 989 (9th Cir.1987) ("The doctrine is applied most often when an individual acts in reliance on a statute or an express decision by a competent court of general jurisdiction ..."); *United States v. Moore,* 586 F.2d 1029, 1033 (4th Cir.1978) ("Of course, one ought not be punished if one reasonably relies on a judicial decision later held to have been erroneous"); *United States v. Mancuso,* 139 F.2d 90, 92 (3d Cir.1943) (while all persons are presumed to know the law, a layman is not expected to know more law than a judge); *United States v. Ehrlichman,* 376 F.Supp. 29, 35 (D.D.C.1974) ("Mistake of law may ... excuse an act if it resulted from good faith reliance upon a court order or decision") (citations omitted).

Judge Arends was constitutionally obligated to apply federal law when he gave advice to the defendant. *See* U.S. Const. Article VI, § 2 (stating that the Constitution, laws, and treaties of the United States "shall be the supreme law of the land; and the judges in every state shall be bound thereby"); *Schlesinger v. Councilman,* 420 U.S. 738, 756, 95 S.Ct. 1300, 1312, 43 L.Ed.2d 591 (1975) ("federal courts are 'not at liberty ... to presume that the decision of the State court would be other than what is required by the fundamental law of the land ...'") (citation omitted); *Public Service Commission of Utah v. Wycoff Co., Inc.,* 344 U.S. 237, 247–48, 73 S.Ct. 236, 242–43, 97 L.Ed. 291 (1952) ("State courts are bound equally with the federal courts by the Federal Constitution and laws"); *Testa v. Katt,* 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947) (state courts are required to enforce federal laws); 28 U.S.C. § 1257 (describing appeal and certiorari of state court decisions involving validity and constitutionality of federal and state statutes); *see also* Colo.Const. Art. XII § 8 (requiring civil officers, including judges, to take oaths in support of United States Constitution). The state judge had more than mere authority to interpret and apply federal law, he had a constitutional duty to do so. Further, state judges have a role in regard to this particular statute because state convictions trigger the applicability of the law. The judge's errors, factually or legally, do not vitiate the effect of his advice.

An opinion of the Eleventh Circuit is to the contrary. In *United States v. Bruscantini,* 761 F.2d 640, 641–42 (11th Cir.), *cert. denied,* 474 U.S. 904, 106 S.Ct. 271, 88 L.Ed.2d 233 (1985) the court declined to apply *Raley* and *Cox* based on a state court judge's assertion that a nolo plea did not make the defendant a convicted felon. *Bruscantini* did not discuss the constitutional authority and duty of state courts to interpret federal law.

Further, the opinion focuses on agency and estoppel principles while *Cox* and *Raley* make clear that the purpose of the rule is to prevent fundamental unfairness and injustice. Though the defense recognized by *Raley* and *Cox* has been called "entrapment by estoppel" it is not an estoppel at all in any meaningful sense. Neither *Cox* nor *Raley* use the word "estoppel" even once. The doctrine stems from the due process clause, not from the common law of contract, equity or agency. Of course, it is settled that estoppel is not available

**296**

against the United States on the same terms as it is against an ordinary litigant. *See, e.g., Heckler v. Community Health Services,* 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984); *Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947); *United States v. Browning,* 630 F.2d 694 (10th Cir.1980), *cert. denied,* 451 U.S. 988, 101 S.Ct. 2324, 68 L.Ed.2d 846 (1981). Further, even in criminal cases, the United States cannot be estopped from prosecuting acts occurring after the law is made clear to the defendant. In this case, for instance, the United States is not estopped from prosecuting Brady if he ever possesses a firearm in the future. Thus, though it is correct as *Bruscantini* suggests, that a state court judge has no agency authority to do an act that will create an estoppel against the United States, neither does a federal judge, or even the President of the United States. The better view is that the defense is not based on the government being bound by the conduct of its agents, but rather, the fundamental unfairness of punishing a defendant for conforming his conduct to an erroneous interpretation of the law by a judge having the power to confine him. Since the United States has given the state and federal courts a joint role in applying the Constitution and laws of the United States, a person is entitled to rely on a state court's views of federal law. Accordingly, this court declines to follow *Bruscantini.*

The due process defense is available even for a crime like this where there is no requirement of proof that the defendant knew he was committing a crime. This defense does not merely negate intent, it negates the criminality of the act. Accordingly, in *United States v. Tallmadge,* 829 F.2d 767, 773-75 (9th Cir.1987) the court applied this principle to reverse a conviction under § 922. *See also United States v. Ehrlichman,* 376 F.Supp. 29, 35 (D.D.C. 1974) (mistake of law defense available to negate intent element of specific intent crimes, or it may excuse an act based on reasonable reliance on a court order or decision).

Upon all of the foregoing, it is

ORDERED that Ora A. Brady is found not guilty of the offense charged in Count I of the indictment and it is

FURTHER ORDERED that Ora A. Brady is found not guilty of the offense charged in Count II of the indictment.