607 A.2d 624
STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. JEFFREY
D. FOGARTY, DEFENDANT–RESPONDENT.

Argued October 21, 1991—Decided June 8, 1992.

*Steven E. Braun,* Senior Assistant Prosecutor, argued the cause for appellant (*Ronald S. Fava,* Passaic County Prosecutor, attorney).

*Brian J. Neary* argued the cause for respondent.

*Boris Moczula,* Deputy Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*Robert J. Del Tufo,* Attorney General, attorney).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal concerns the validity of the novel defense of quasi-entrapment by a defendant charged with driving while intoxicated (DWI), a violation of *N.J.S.A.* 39:4–50.

I

Defendant, Jeffrey D. Fogarty, attended a wedding reception at a restaurant in Haledon Borough. At approximately 1:50 a.m., defendant and several other wedding guests left the reception and entered the restaurant parking lot. Defendant was intoxicated when he left the reception. According to defendant a friend had previously agreed to drive him home after the reception. Defendant had arranged for Robert Leonard and his brother Jeffrey Leonard to drive his truck home for him. However, Robert and Jeffrey Leonard, already in the parking lot, began arguing over who would drive defendant's truck. The Leonard brothers' argument soon escalated into a brawl.

A Haledon Police officer who noticed the altercation immediately radioed for backup assistance. Approximately six officers reported to the parking lot to control the crowd that had gathered around the fight. The police used physical force to restrain Robert Leonard as he resisted arrest.

Defendant did not participate in the fight. However, on observing how the police were treating Robert Leonard, defendant told the arresting officers, whom he could not identify by name, to treat Leonard less roughly. One unnamed officer ordered defendant to leave the parking lot. Defendant ignored that order.

Seeing that defendant had not left the scene of the altercation, the unnamed officer repeated his order. According to defendant, the officer was carrying a nightstick in his hand and directed defendant to "get in the truck and get out of here or you're going too." Defendant understood the order to mean that he would be taken to the police station if he did not comply. The officer allegedly walked defendant over to his truck. Defendant did not inform the officer that he had been drinking earlier that evening.

The truck's engine was already running. Defendant entered the truck, put it into reverse, and proceeded to back into a parked police car.

Defendant was arrested and charged with DWI. The police administered two breathalyzer tests to defendant. Both tests revealed a .12% blood-alcohol level, a reading above the .10% level defined as intoxication.

At defendant's municipal court trial, he attempted to establish a justification defense to the DWI charges. On the basis of the breathalyzer tests, the municipal court found defendant guilty. Defendant was then tried *de novo* before the Law Division. The Law Division found defendant guilty, reasoning that even if the entrapment defense were available, defendant had failed to establish it by a preponderance of evidence.

On appeal, defendant based his claim that he was not guilty of DWI on the theory that he would not have driven *but for* the order of the police. Agreeing with defendant, the Appellate Division reversed the conviction and held that on remand the municipal court should exonerate defendant under a theory of "quasi-entrapment" if he could prove by a preponderance of the evidence that he would not have driven his truck *but for* the police order. We granted certification, 126 *N.J.* 324, 598 *A.*2d 883 (1991), and now reverse the Appellate Division judgment and reinstate the judgment of the municipal court.

## II

■ The Appellate Division correctly recognized that traditional entrapment was not available as a defense in defendant's DWI case. The New Jersey Code of Criminal Justice (Code) provides that entrapment constitutes an affirmative defense to criminal offenses. *N.J.S.A.* 2C:2–2. However, we have uniformly recognized that motor vehicle violations, including violations of the DWI statute, are not offenses under New Jersey's Criminal Code. *State v. Hammond*, 118 *N.J.* 306, 571 *A.*2d 942 (1990). Thus, Code defenses such as entrapment do not apply to the motor vehicle offense of DWI. *See, e.g., Hammond, supra*, 118 *N.J.* at 318, 571 *A.*2d 942 (involuntary intoxication is not a defense to DWI). Moreover, due to the comparative lack of severity of penalties for DWI, certain constitutional rights do not apply to DWI proceedings. *See, e.g., State v. Hamm*, 121 *N.J.* 109, 577 *A.*2d 1259 (1990) (no right to jury trial in prosecution for third DWI offense); *State v. Macuk*, 57 *N.J.* 1, 268 *A.*2d 1 (1970) (*Miranda* warnings not required before breathalyzer test).

■ Nonetheless, a defendant charged with a motor vehicle offense does not forfeit all constitutional and common-law defenses. *See State v. DeLuca*, 108 *N.J.* 98, 527 *A.*2d 1355, *cert. denied*, 484 *U.S.* 944, 108 *S.Ct.* 331, 98 *L.Ed.*2d 358 (1987) (prohibition against double jeopardy applies to DWI cases);

*State v. Tropea,* 78 *N.J.* 309, 316, 394 *A.*2d 355 (1978) (in motor-vehicle offenses considerations of fundamental fairness bar retrial because of insufficiency of evidence).

■ At common law, entrapment existed in two forms: subjective and objective. Subjective entrapment arises when police implant a criminal plan in the mind of an innocent person who otherwise would not have committed the crime so that they may prosecute that person. *State v. Rockholt,* 96 *N.J.* 570, 576, 476 *A.*2d 1236 (1984).

■ Objective entrapment, on the other hand, does not consider the predisposition of the defendant. *State v. Talbot,* 71 *N.J.* 160, 168, 364 *A.*2d 9 (1976). Rather, objective entrapment focuses on the conduct of the police. It exists when the police conduct causes an average law-abiding citizen to commit the crime, or when the conduct is so egregious as to impugn the integrity of the court that permits a conviction. *Ibid.; see also State v. Molnar,* 81 *N.J.* 475, 484, 410 *A.*2d 37 (1986).

■ The Code combined the elements of subjective and objective entrapment into one test. The Code test requires the court to analyze how the defendant's predisposition and the police conduct interrelate and to ask which one directly caused the commission of the crime. *See State v. Rockholt, supra,* 96 *N.J.* at 577, 476 *A.*2d 1236. We recognize, however, that even after the Code,

> there is still a constitutional due process underpinning to be observed. There may be situations in which the conduct of law enforcement officers is so egregious that the results of that conduct must be set aside as a matter of due process although the subjective element of the Code entrapment defense is not satisfied. [*Id.* at 580, 476 *A.*2d 1236.]

We have recently reaffirmed that the New Jersey Constitution embodies an entrapment defense as a matter of due process. *State v. Johnson,* 127 *N.J.* 458, 473, 606 *A.*2d 315, 322 (1992). "The defense arises when conduct of government is patently wrongful in that it constitutes an abuse of lawful

power, perverts the proper role of government, and offends principles of fundamental fairness." *Ibid.*

No form of entrapment applies to this case. The police did not plant a criminal plan in defendant's mind and did not engage in any sort of impermissible conduct. The police officer did not know defendant was intoxicated. Moreover, when he ordered defendant to leave, the officer was legitimately exercising his law-enforcement authority in an attempt to control a rapidly escalating incident precipitated by the Leonard brothers' fight. The police did not coerce defendant into driving his vehicle through use or threats of violence. The entrapment defense is therefore unavailable to defendant.

### III

Although recognizing that defendant could not assert entrapment as a defense, the Appellate Division nonetheless held, "on the basis of considerations of fundamental fairness akin to those which underlie the entrapment defense," that defendant could rely on a "quasi-entrapment" defense if he could show that *but for* the police order, he would not have driven his truck.

The Appellate Division apparently derived its quasi-entrapment defense from the objective-entrapment defense. In evaluating objective-entrapment claims, courts consider whether the police misconduct was so egregious as to violate a defendant's rights to due process and fundamental fairness. *State v. Gibbons,* 105 *N.J.* 67, 74, 519 *A.*2d 350 (1987). In order for the defendant to assert successfully an objective-entrapment defense, police must engage in law-enforcement methods that do not "measure up to commonly accepted standards of decency and conduct to which the government must adhere." *State v. Talbot,* 71 *N.J.* 160, 168, 364 *A.*2d 9 (1976).

No facts in this case even suggest that the police engaged in egregious conduct. The police did not know that defendant was intoxicated. In fact, defense counsel, in his summation before

the municipal court, acknowledged that the police conduct was reasonable.

Moreover, the objective-entrapment defense expresses "a legislative policy of discouraging improper police inducements to criminal conduct." *Rockholt, supra,* 96 *N.J.* at 583, 476 *A.*2d 1236. The Appellate Division's weaker "but for" test, in not considering the intent behind a police officer's actions, fails to serve the deterrent purpose behind the defense.

New Jersey has an overriding goal to rid the roads of drunk drivers. The duty rests on the operator not to drink and drive. A person who finds himself or herself in defendant's situation should inform police that he or she is intoxicated. Such a person should also seek an alternative to violating the law. Defendant did not attempt to avail himself of any noncriminal alternative. Instead he chose to drive himself, knowing that he had consumed several alcoholic beverages.

▮ Defendant submits that he interpreted the officer's order to mean that he had no alternative to leaving in his truck. Defendant may have subjectively believed that to be true but his belief is irrelevant. Indeed, we question whether any quasi-entrapment defense that relies in part or entirely on defendant's subjective intent can ever be a defense to a DWI charge. The primary purpose of *N.J.S.A.* 39:4–50 "is to curb the senseless havoc and destruction caused by intoxicated drivers." *State v. Tischio,* 107 *N.J.* 504, 512, 527 *A.*2d 388 (1987), *appeal dismissed,* 484 *U.S.* 1038, 108 *S.Ct.* 768, 98 *L.Ed.*2d 855 (1988). Toward that end, the Legislature has sought "to discourage long trials complicated by pretextual defenses." *Hammond, supra,* 118 *N.J.* at 317, 571 *A.*2d 942. DWI is an absolute liability offense requiring no culpable mental state. The State need not demonstrate a defendant's culpable state of mind to prove a violation of *N.J.S.A.* 39:4–50. *Hammond, supra,* 118 *N.J.* at 314–15, 571 *A.*2d 942. Defendant drove his car when his blood-alcohol level was .12%. The Legislature has made driving with a .10% blood-alcohol level or greater a *per se* offense.

*Ibid.* Thus, because defendant's blood-alcohol level was .12%, he was *per se* guilty of DWI.

Furthermore, such a subjective standard as embodied in the Appellate Division's "but for" test does not work in DWI cases, in which the risk of impaired judgment as a result of intoxication is high. Under a subjective standard, the more intoxicated the driver is, the more "reasonable" his or her choosing to drive would be. *See Hammond, supra,* 118 *N.J.* at 316, 571 *A.*2d 942 ("The application of the involuntary intoxication defense would be anomalous: the more drunk the driver is, the less culpable he or she would be."). That approach not only makes no sense but also is contrary to our cases mandating the use of an objective test with respect to "constitutional" entrapment. *See, e.g., Rockholt, supra,* 96 *N.J.* at 581, 476 *A.*2d 1236 ("The defendant would not satisfy this requirement if the evidence demonstrated that he was unusually susceptible to inducement and that an ordinary person would not have succumbed to the type of inducement to which he had succumbed.").

A clear legislative intent and a strong legislative policy exist to discourage long trials complicated by pretextual defenses. *Hammond, supra,* 118 *N.J.* at 317, 571 *A.*2d 942. Defendant seeks to avail himself of a subjective pretextual defense in this case. He does not contend that the police officer ordered him to drive drunk; he asserts only that he believed that some unidentified police officer told him to leave. That kind of defense has every potential for being pretextual and would "impede the efficient and successful prosecution of those who drink and drive." *State v. Schreiber,* 122 *N.J.* 579, 587, 585 *A.*2d 945 (1991).

In our DWI decisions we attempt to eliminate every possibility of pretextual defenses. We have done so not only because of any doubts about the veracity of the factual defense offered, but also because of the potential for pretext. For example, in *Hammond, supra,* 118 *N.J.* 306, 571 *A.*2d 942, we rejected a

defendant's attempt to assert involuntary intoxication as a defense to DWI. Hammond had consumed fruit juice without knowing that it contained alcohol. The Court pointed out that the defense of involuntary intoxication had "every potential for being pretextual." *Id.* at 318, 571 *A.*2d 942.

In this case the risk of pretext is even greater. The scene is all too common: a brawl in a parking lot outside a bar, a restaurant, or a sports stadium, or indeed at any gathering where a number of people are present. The police arrive and decide that public safety requires that they immediately disperse the crowd. The police do not have time to assess the risk that some ordered to leave may be drunk. Moreover, if the police had to administer sobriety tests to everyone at those events before dispersing them, their law-enforcement efforts would suffer.

After a police order to disperse, those who had intended to leave anyway, those without fear of arrest or of physical assault, those without any reason to fail to tell the police that they are drunk, drive away intoxicated. Obviously, if the law were to permit those people to offer as a defense that they drove only because they reasonably feared that telling the police that they were drunk might lead to arrest, the invitation to offer a pretext would be clear.

But even if the officer accompanies his or her order with a threat of arrest to anyone who fails to leave immediately— leaving no doubt as to its fulfillment even if the delay is as short as is necessary to say "I am drunk"—that circumstance cannot constitute a defense. For if it did, the possibility of pretext where no such threat was made is clear; indeed, the possibility exists even if the officer admits making the threat.

Drinking is legal, and for those who carefully arrange for a designated driver when they drink, the possible results implicit in this case can be harsh. The risk of that harshness must be balanced against the risk of damage caused by pretextual defenses—damage to the enforcement of New Jersey's drunk-

driving laws. As in prior cases, we conclude that the balance weighs in favor of consistent and strict enforcement. To sanction defendant's quasi-entrapment defense would "disserve broader policy goals [to combat drunk driving]." *See Hammond, supra,* 118 *N.J.* at 318, 571 *A.*2d 942.

## IV

Defendant argues that he drove while intoxicated because the police officer essentially coerced him to do so. Putting aside the Appellate Division's label of quasi-entrapment, we perceive that what defendant really alleges is the defense of duress.

 Duress consists in forcing a person to act against his or her own will. *D'Aloia v. Summit,* 89 *N.J.L.* 154, 155, 97 *A.* 722 (Sup.Ct.1916). It does not exist when a person can choose whether he or she will perform the act said to have been done under duress. *Ibid.*

 Like entrapment, the Code defense of duress is not available to a DWI defendant. See discussion *supra* at 64, 607 *A.*2d at 626. However, common-law defenses may be available as long as they have not been precluded by the statute defining the offense. *See State v. Tate,* 102 *N.J.* 64, 74, 505 *A.*2d 941 (1986) (common-law defense available only when Legislature has not foreseen circumstances encountered by defendant). However, whether a common-law defense does remain is frequently a difficult issue. *Id.* at 73, 76, 505 *A.*2d 941.

 Even if we were to resort to the common law, however, defendant has failed to establish that he acted under duress in this case. Duress is an appropriate defense only when the defendant is subject to coercion through threats or use of unlawful force that a person of reasonable firmness would be unable to resist. *State v. Toscano,* 74 *N.J.* 421, 442, 378 *A.*2d 755 (1977). For example, in *Browning v. State,* 31 *Ala.App.* 137, 13 *So.*2d 54 (1943), police chased and shot at the defendant in an attempt unlawfully to arrest him. The defen-

dant testified that he feared for his life and therefore was compelled to speed. *Id.* 13 *So.*2d at 56. The court held that whether the defendant was acting under duress when he engaged in reckless driving was a question for the jury.

The facts of *Browning* are in no way similar to those of the present case. Fogarty was not subject to threats or use of unlawful force. Rather, in ordering defendant to leave the scene of the brawl, the police officer in this case was exercising his legitimate law-enforcement authority. Moreover, that defendant may have feared being arrested himself does not establish duress.

A case more like the present one is *State v. Falco,* 60 *N.J.* 570, 292 *A.*2d 13 (1972). In *Falco,* this Court rejected duress as a defense when defendant, a police officer, filed a report that misstated that he had not been present at a barroom brawl when in fact he had been. *Id.* at 586–87, 292 *A.*2d 13. The defendant's claim of duress rested on the fact that his job as a police officer required him to file the report. The court emphasized that because no one had ordered the defendant to file a false report, but merely to file a report, there had been no duress. *Id.* at 586, 292 *A.*2d 13.

Similarly, in the present case, no one ordered defendant to get drunk and no one ordered defendant to drive drunk. The police did not coerce defendant into driving his vehicle through use or threats of violence. The police officer merely ordered defendant to get in his truck and leave the scene of the fight. That does not constitute duress.

V

Nor is defendant's case similar to United States Supreme Court cases that prohibit the State from prosecuting defendants for acts committed pursuant to permission granted by a government official. See *Raley v. Ohio,* 360 *U.S.* 423, 79 *S.Ct.* 1257, 3 *L.Ed.*2d 1344 (1959), and *Cox v. Louisiana,* 379 *U.S.* 559, 85 *S.Ct.* 476, 13 *L.Ed.*2d 487 (1965). In *Raley,* the

State prosecuted the defendants for contempt after they had invoked the privilege against self-incrimination. The defendants had invoked the privilege because State officials had specifically told them that they could. Similarly, in *Cox,* the State prosecuted the defendant for demonstrating near a courthouse after a State official had given permission to demonstrate across the street from the courthouse.

In both cases, State officials had permitted the defendants to undertake the specific act for which the State prosecuted them. In contrast, the police officer in the present case did not give defendant permission to drive drunk.

In addition, neither *Raley* nor *Cox* involved situations in which a defendant could have corrected a mistaken assumption on the part of the State official. The defendants in those cases were just as unaware that their actions were illegal as were the State officials who had permitted them to undertake those actions. Fogarty, on the other hand, did know that he had consumed several alcoholic beverages. Unlike the defendants in *Raley* and in *Cox,* Fogarty had the option of informing the police that he was intoxicated. However, he failed to exercise that option. Because of Fogarty's silence, the police did not know he was intoxicated. Fogarty's silence thus led to his driving while intoxicated and his subsequent arrest.

A case more similar to the present one is *Adams v. State,* 585 *So.*2d 161 (Ala.1991). In *Adams,* a police officer ordered the defendant to "move along" after he observed the defendant lying across the front seat of her car. The same police officer arrested the defendant for DWI a short time after having ordered her to move. The defendant was ultimately convicted of DWI on the basis of her having failed field sobriety tests.

The Alabama Court of Criminal Appeals reversed the defendant's conviction, holding that the police officer had entrapped her. *Adams v. State,* 585 *So.*2d 156 (1990). The court, finding that a reasonable officer should have suspected that the defendant was "under the influence," *id.* at 159, agreed with the

defendant's argument that she "should not be held liable for a traffic offense which resulted directly from her obeyance of the order and directions of a state trooper." *Id.* at 158.

The Alabama Supreme Court reversed, finding "no evidence of governmental inducement by the state trooper in instructing [the defendant] to move along." 585 *So.*2d 161, 163 (1991). The court emphasized that the evidence was uncontroverted that the trooper did not know that the defendant was intoxicated when he ordered her to move her car. *Ibid.* The court therefore reinstated the defendant's DWI conviction.

Identical logic applies to the case before us today. No one has questioned the reasonableness of the police conduct. Moreover, no one disputes that the police did not know that defendant was intoxicated before he drove. We conclude that the lack of any police misconduct precludes any entrapment-based defense. As explained by one of the dissenting lower court judges in *Adams,* permitting the defendant in that case to escape conviction despite her failure to have informed the police officer of her intoxication was unfair.

> Just because the officer failed to detect appellant's condition does not lessen her culpability. She violated the law. The responsibility is hers, but the effect of the majority opinion [of the intermediate court] places it on the officer. Such result is absurd. [585 *So.*2d at 161 (Patterson, J., dissenting).]

The facts of the present case highlight this absurdity even more clearly than those of *Adams.* In this case, the police were involved in breaking up a fight and in subsequently subduing a man resisting arrest. The police officers' attention was not and should not have been focused on defendant. The police's sole concern was to restore order and to that end have defendant leave the scene. Perhaps the entire drunk-driving incident could have been averted if defendant had told the police that he was intoxicated. However, that he did not bring his state of intoxication to the attention of the police officer or that the police officer did not otherwise notice his condition cannot absolve defendant of his DWI conviction. Defendant is

guilty of drunk driving because he failed to refrain from getting behind the wheel while he was intoxicated.

Moreover, the facts here were not so unusual as to warrant special treatment. To allow the defendant to assert quasi-entrapment as a defense to a charge of driving while intoxicated would "surely frustrate the efficient and vigorous enforcement of our laws against driving while intoxicated." *See Hammond, supra,* 118 *N.J.* at 318, 571 *A.*2d 942.

## VI

Because defendant has failed to establish any defense of entrapment, quasi-entrapment, or duress to his DWI prosecution, we reverse the Appellate Division judgment and reinstate the judgment of conviction.

STEIN, J., dissenting.

A conviction for driving while intoxicated (DWI) ordinarily is not an occasion for hand-wringing about issues of fundamental fairness and due process. The cases are usually cut and dried: a defendant who had been driving a motor vehicle is found to have a blood-alcohol reading, based on a breathalyzer test, of .10 or above. Our decisions confirm this Court's determination to enforce strictly the strong legislative policy to impose swift and certain punishment on those who would drive a motor vehicle while under the influence of alcoholic beverages. See *State v. Hammond,* 118 *N.J.* 306, 571 *A.*2d 942 (1990); *State v. Tischio,* 107 *N.J.* 504, 527 *A.*2d 388 (1987), *appeal dismissed,* 484 *U.S.* 1038, 108 *S.Ct.* 768, 98 *L.Ed.*2d 855 (1988).

But once in a great while a DWI case comes along that presents facts so bizarre and remote from the public policy underlying the law that even a Court as committed as this one to the strict enforcement of the drunk-driving statutes can pause to make certain that no injustice has been done. The comedy of errors that placed defendant, Fogarty, behind the wheel of his truck—notwithstanding his carefully having ar-

ranged for friends to drive him to and from the wedding he attended on the night in question—bears little relation to the irresponsible conduct courts typically encounter in DWI cases. Unfortunately for Fogarty, the unfamiliar defense suggested by the unusual facts of his case—quasi-entrapment, or estoppel—is primarily relied on in out-of-state cases and better explained by commentators than by the courts that have invoked it. Because the majority opinion does not correctly identify the elements of the estoppel defense, it mistakenly concludes that that defense, as a matter of law, cannot apply to this case. I disagree and would remand for a new trial to resolve the factual issues that determine whether the estoppel defense is available to Fogarty.

I

On April 15, 1989, Fogarty attended a wedding with several friends at the Brownstone House in Haledon. He had arrived at the wedding as a passenger in his Chevrolet Blazer. Fogarty testified that his friend, Jeff Leonard, drove the Blazer because he knew the route to the wedding. Fogarty did not plan to drive at all that evening and had made arrangements to be driven home by another friend, Jim Davis. Either Jeff Leonard or his brother, Robert, was to drive the Blazer after the wedding to a post-wedding party that Fogarty did not plan to attend.

Fogarty, Davis, and Davis's wife were leaving the wedding at approximately 2:00 a.m., when they noticed other guests engaged in a scuffle in the Brownstone House parking lot. Fogarty walked towards the fight, which was in process near his Blazer in the center of the lot. According to Fogarty, the engine of the Blazer was running. Jim Davis testified that yet another Leonard brother, Mike, had started the engine.

The "scuffle" in the parking lot (the Law Division stated that it may have been a "semi-riot") began when Robert and Jeff Leonard, both approximately six-feet, two-inches tall and weigh-

ing 210 pounds, started arguing and then fighting over who would drive Fogarty's Blazer. Officer DeKorte, who was the only witness for the State, saw the fight and radioed for backup assistance. Jeff Leonard left, and Robert started arguing with several of his friends and DeKorte. It took DeKorte and five or six other officers (some of whom were from nearby Paterson) five to ten minutes to restrain Robert Leonard. During that time, Leonard was handcuffed and his face was pushed into the ground. While Leonard was in that position, an officer struck him with a nightstick. Defense counsel stated at trial that Leonard was charged with and subsequently pled guilty to resisting arrest.

Defendant claims that he urged the officer who had hit Robert Leonard with a nightstick not to be so rough because Leonard already had been handcuffed. The officer, who did not testify at trial and whose identity remains unknown, responded by ordering defendant to leave. That order apparently was part of a general attempt by the police to disperse the crowd. Jim Davis also was ordered to leave under threat of arrest. Defendant did not immediately obey the officer's command. Defendant described the officer as "a big guy, bigger than Bob." Fogarty testified that he told the officer that he was the owner of the Blazer. According to defendant, the officer then approached him with "a black stick in his hand, the same one that he was hitting Bob with," and said, "Get in the truck and get out of here, or you're going, too." Defendant understood the order to mean that he would be taken to the police station if he did not comply.

Defendant testified that following the second order the officer walked him over to the Blazer, carrying his nightstick. Defendant did not inform the officer that he had been drinking. Defendant climbed into the Blazer, shifted into reverse, and unwittingly backed into DeKorte's squad car, which was located directly behind the truck. DeKorte saw defendant exit the vehicle and behave erratically. He detected the smell of alcohol

on defendant's breath. He arrested defendant and drove him to police headquarters. The breathalyzer tests subsequently administered yielded identical results of a blood-alcohol concentration of .12 percent.

Fogarty was charged with violating *N.J.S.A.* 39:4–50(a). At the municipal court hearing, Fogarty testified that he had had no intention of driving that evening, and had moved the truck only because he had believed that under the circumstances he had no reasonable alternative. His counsel argued that the officer's express order to Fogarty to move his truck constituted, under the unique circumstances, a defense to the DWI charge. The court, after making various statements manifesting incomprehension of Fogarty's argument, finally expressed understanding of the proffered defense. The court nevertheless found defendant guilty, stating that Fogarty's defense would best be tested on appeal. The court observed that "[i]t's a unique defense but it's not for me to decide. You're probably going to have to appeal that and get a ruling. I'm going on *Tischio.*" The court did not pass on the credibility or demeanor of the various witnesses.

The Law Division affirmed defendant's conviction, implying at one point that its review was *de novo* on the record below, but also incorrectly describing its function as that of reviewing the record merely to determine whether there was sufficient evidence to sustain the findings of the municipal court. Although the municipal court had made no findings on the credibility of witnesses, the Law Division inexplicably referred to that court's determination that "the police officer is far more credible than * * * defendant." The Law Division also overlooked Fogarty's uncontradicted testimony in municipal court that he had told the police officer he owned the Blazer, expressing disbelief that the officer told Fogarty to drive the Blazer: "I can't see how in the world would this * * * police officer know to which vehicle Fogarty was connected." Affirming Fogarty's conviction, the Law Division reasoned that the proffered "entrapment" defense was unavailing in the absence of

proof that the officer knew that Fogarty was intoxicated when he ordered him to drive the truck.

The Appellate Division reversed in an unpublished opinion and remanded the matter to the municipal court for a new trial. The court determined that the Law Division had improperly rejected as inherently unbelievable defendant's uncontradicted testimony of the events leading to his operation of the Blazer. Although acknowledging that the common-law defense of entrapment was inapplicable because the officer lacked knowledge of defendant's intoxication when ordering him to drive, the court relied on out-of-state cases to reach the conclusion that a defense of "quasi-entrapment," or estoppel, would be available if defendant could prove that he would not have driven the Blazer but for the officer's order.

## II

The estoppel defense adverted to by the Appellate Division, although unfamiliar to New Jersey case law, has a respectable lineage rooted in due process and traceable directly to two United States Supreme Court decisions, *Cox v. Louisiana*, 379 *U.S.* 559, 85 *S.Ct.* 476, 13 *L.Ed.*2d 487 (1965), and *Raley v. Ohio*, 360 *U.S.* 423, 79 *S.Ct.* 1257, 3 *L.Ed.*2d 1344 (1959). Its premise is that one should not be subject to prosecution for acts committed at the direction of a governmental official. The majority opinion apparently assumes that an essential element of the defense is police misconduct "so egregious as to violate defendant's rights to due process and fundamental fairness." *Ante* at 66, 607 *A.*2d at 628. Not so. Misconduct by the government official whose direction is followed is not critical to the estoppel defense. No evidence in this record suggests that the officer who told Fogarty to drive did anything improper, his obvious intention being to break up the brawl that had erupted in the parking lot. The critical element of the defense is whether reliance on the official's direction was objectively reasonable under the prevailing circumstances.

In *Raley,* appellants had raised the privilege against self-incrimination when questioned by a State legislative commission. The commission assured appellants that they could exercise their constitutional right to remain silent. After they did so, the State prosecuted them for contempt. The Supreme Court reversed the convictions even though there was no suggestion that the commission had intended to deceive appellants. 360 *U.S.* at 438, 79 *S.Ct.* at 1266, 3 *L.Ed.*2d at 1355. Relying on the Due Process Clause of the Fourteenth Amendment, the Court declared, "After the Commission, speaking for the State, acted as it did, to sustain the Ohio Supreme Court's judgment would be to sanction an indefensible sort of entrapment by the State—convicting a citizen for exercising a privilege which the State had clearly told him was available to him." *Id.* at 425–26, 79 *S.Ct.* at 1260, 3 *L.Ed.*2d at 1348.

Similarly, in *Cox v. Louisiana, supra,* 379 *U.S.* 559, 85 *S.Ct.* 476, 13 *L.Ed.*2d 487, the Chief of Police of Baton Rouge had given the defendant permission to demonstrate across the street from the courthouse. The demonstration followed, but the Sheriff withdrew the permission because of his mistaken belief that the demonstration threatened to breach the peace. The defendant then was prosecuted for conducting a demonstration "near" a courthouse. A fair inference from the opinion is that the Police Chief had given the defendant permission without having any intent to induce criminal activity. Following *Raley,* and reasoning that the defendant "was advised that a demonstration at the place it was held would not be one 'near' the courthouse within the terms of the statute," the Court held that the Due Process Clause "does not permit convictions to be obtained under such circumstances." *Id.* at 571, 85 *S.Ct.* at 484, 13 *L.Ed.*2d at 496; *accord United States v. Pennsylvania Indus. Chem. Corp.,* 411 *U.S.* 655, 670–75, 93 *S.Ct.* 1804, 1814– *U.S.* 655, 670–75, 93 *S.Ct.* 1804, 1814–17, 36 *L.Ed.*2d 567, 578– 81 (1973) (defendant entitled to assert its reliance on longstanding administrative construction of statute as defense to illegal pollution charge); *United States v. Laub,* 385 *U.S.* 475, 487, 87 *S.Ct.* 574, 581, 17 *L.Ed.*2d 526, 534 (1967) ("Ordinarily, citizens

may not be punished for actions undertaken in good faith reliance upon authoritative assurance that punishment will not attach."); *see also Sundstrom v. United States,* 419 *U.S.* 934, 936, 95 *S.Ct.* 205, 206, 42 *L.Ed.*2d 163, 164 (1974) (Douglas, J., dissenting from denial of *certiorari*) ("Due process forbids the Government from actively misleading a citizen as to the law's commands. A citizen may be misled as much by a failure to correct an erroneous impression as by incorrect advice, affirmatively conveyed." (citing *Cox, supra,* 379 *U.S.* 559, 85 *S.Ct.* 476, 13 *L.Ed.*2d 487, and *Raley, supra,* 360 *U.S.* 423, 79 *S.Ct.* 1257, 3 *L.Ed.*2d 1344)).

The holding of *Raley* and *Cox* has been applied in other federal cases in which the defendant relied on the erroneous advice of a governmental official, even though the official had no intention of inducing a violation of law. In *United States v. Brady,* 710 *F.Supp.* 290 (D.Colo.1989), a county judge informed the defendant, a convicted felon, that he could continue to use a firearm for hunting and trapping when, in fact, a federal statute barred convicted felons from possessing firearms. Under the statute, a person's reasonable belief that he was violating no law was not a defense because specific intent was not an element of the crime. *Id.* at 294. The court nevertheless dismissed the indictment, reasoning that to punish the defendant for conforming his conduct to a judge's erroneous interpretation of the law would be fundamentally unfair. *Id.* at 296; *accord United States v. Albertini,* 830 *F.*2d 985 (9th Cir.1987) (defendant relied on Ninth Circuit decision later reversed by United States Supreme Court); *United States v. Tallmadge,* 829 *F.*2d 767 (9th Cir.1987) (defendant relied on erroneous advice of federally-licensed gun dealer that he was permitted to purchase firearms); *Dellums v. Powell,* 566 *F.*2d 167 (D.C.Cir. 1977) (defendants held demonstration in reliance on permission of Speaker of House of Representatives), *cert. denied,* 438 *U.S.* 916, 98 *S.Ct.* 3146, 57 *L.Ed.*2d 1161 (1978). *But see United States v. Bruscantini,* 761 *F.*2d 640, 641–42 (11th Cir.) (identical situation as *Brady* but declining to apply *Cox* and *Raley*

because no entrapment when government that advises is not the same as government that convicts), *cert. denied,* 474 *U.S.* 904, 106 *S.Ct.* 271, 88 *L.Ed.*2d 233 (1985).

Another line of cases has applied the principle of *Raley* and *Cox* to circumstances in which the governmental official, invariably a police officer, having knowledge of a defendant's disability has nevertheless directed a defendant to take action resulting in a violation of law. *See People v. Jensen,* 37 *Ill.App.*3d 1010, 347 *N.E.*2d 371, 375–76 (1976) (affirmative defense of entrapment available when ranger noticed defendant's intoxicated state and ordered defendant to move car, and defendant subsequently was prosecuted for driving with suspended license); *State v. Miller,* 187 *So.*2d 461 (La.Ct.App.1966) (reversing conviction of defendant charged with monitoring radio frequency used by sheriff when police ordered defendant to connect loose wires so radio would function); *State v. Bisson,* 491 *A.*2d 544 (Me.1985) (defendant entitled to instruction on entrapment defense when he was ordered to drive after allegedly informing officers that he was too drunk to drive); *City of Hamilton v. Collier,* 44 *Ohio App.*2d 419, 339 *N.E.*2d 851, 853 (1975) (defendant cannot be prosecuted for possessing open container of alcohol on public road when he exited automobile and stood on public road pursuant to police order); *Evans v. State,* 690 *S.W.*2d 112, 114 (Tex.Ct.App.1985) (dictum) (noting that if officer had told defendant to drive and had been aware of defendant's intoxication, defendant might have been entrapped); *State v. Vanderlas,* 483 *A.*2d 263 (Vt.1984) (entrapment instruction appropriate where police, on determining that passenger was intoxicated, drove her to car and told her not to drive for two hours).

The foregoing cases are relevant to but not decisive of defendant's culpability, because according to Fogarty's testimony the officer who ordered him to drive his truck was unaware that Fogarty was intoxicated. The Court is of the view that Fogarty was obligated, no matter how emphatic the officer's

direction, to inform the officer that he was too drunk to drive. *Ante* at 67, 607 *A*.2d at 628. The Appellate Division did not emphasize the reasonableness of Fogarty's conduct, either in failing to inform the officer of his intoxication or in following the officer's order, focusing instead on whether Fogarty could establish by a preponderance of the evidence that he would not have driven but for the police officer's instruction.

The Court rejects the Appellate Division's "but for" standard, questioning whether any "defense that relies in part or entirely on defendant's subjective intent" can successfully be asserted in a DWI prosecution. *Ante* at 67, 607 *A*.2d at 628. The Court's analysis, however, fails entirely to consider whether defendant's *objectively* reasonable reliance on the officer's direction could constitute a defense to the charge of DWI. Indeed, the Court concludes that however reasonable Fogarty's reliance on the officer's command may have been, the Court cannot countenance an estoppel-type defense because its "potential for pretext" raises a risk of "damage to the enforcement of New Jersey's drunk-driving laws." *Ante* at 69–70, 607 *A*.2d at 629. The Court raises the ominous specter of hordes of intoxicated drivers being dispersed by police outside of numerous bars, restaurants, and stadiums, all asserting as a defense to DWI charges that they drove in response to police directives. *Ante* at 69, 607 *A*.2d at 629. That the Court goes to such lengths to justify its refusal to permit Fogarty to present his defense is ample indication of its discomfort with its own rationale.

The commentators who have addressed the subject agree that a standard of objectively reasonable reliance on a governmental directive properly balances the State's law-enforcement interest against the public interest in avoiding inequitable prosecutions. Recent Cases, *Defenses: State Estopped to Prosecute Criminal Conduct Suggested by Police*, 81 *Harv.L.Rev.* 895, 897–98 (1968) ("In assessing the reasonableness of the citizen's reliance account must be taken of the circumstances from the standpoint of the defendant at the time of his action."); *accord* Note,

Applying Estoppel Principles in Criminal Cases, *78* Yale L.J. *1046, 1057 (1969) ("Before a court can judge whether reliance on official misleading was justifiable, it will have to consider all the circumstances under which reliance is claimed.").*

A handful of out-of-state cases acknowledge that in certain circumstances police conduct can be sufficiently intimidating as to make it reasonable for a defendant not to inform the officer of his disability and not to pursue other alternatives. *People v. Donovan,* 53 *Misc.*2d 687, 279 *N.Y.S.*2d 404 (Ct.Spec.Sess.1967), illustrates the point. Police officers found the defendant asleep in her car parked in the homeowner's driveway. The officers ordered her to leave. When she refused, the officers drove off but parked a block away in order to keep the driveway in sight. When the defendant drove out of the driveway shortly thereafter, she was arrested and charged with driving while impaired. In holding that the officers' conduct estopped the State from prosecuting the defendant, the court noted:

> There can be no doubt that defendant here was keenly disappointed in the actions of the police who suggested that she drive the car and then arrested her when she did. It may be said that defendant knew that she was not in fit condition to drive, and that she should have explained this to the police. But the average citizen does not argue with uniformed authority; when the law suggests "Move on", the healthy instinct is to get going. Moreover, one in defendant's condition cannot be expected to discuss with reasoned calm the merits and dangers of the proposed action. [*Id.* 279 *N.Y.S.*2d 404, at 406.]

In *State v. Ragland,* 4 *Conn.Cir.* 424, 233 *A.*2d 698 (1967), the defendant was charged with illegal parking and was instructed by the police officer to drive to headquarters. The defendant did not inform the officer his license had been suspended, but asked instead if the officer would drive him. The officer refused, so the defendant drove to headquarters and was charged with driving with a suspended license. Although acknowledging that "[t]he facts do not bring the matter squarely within the doctrine of entrapment," the Court dismissed the charge, concluding that the defendant's operation was involuntary "for he was then under arrest and subservient to the orders of an officer." *Id.* 233 *A.*2d at 701–02; *accord*

*Applying Estoppel Principles in Criminal Cases, supra,* 78 *Yale L.J.* at 1065–66 (orders by police officer to commit minor crimes "offer an all but irresistible case for estoppel. Sufficient discretion makes an official by and large *the* lawmaker, the ordinary citizen cannot be expected to challenge the legal accuracy of the order and the official's legal power to give it.").

Other courts have understood that a police officer's order may not be a subject for debate. "An order given in the capacity of a police officer is a particularly potent form of government inducement." *State v. Bisson, supra,* 491 *A.*2d at 548. This Court has made the same point in the context of allegedly consensual searches. "Many persons, perhaps most, would view the request of a police officer to make a search as having the force of law." *State v. Johnson,* 68 *N.J.* 349, 354, 346 *A.*2d 66 (1975).

The majority makes short shrift of the issue of the reasonableness of defendant's reliance on the officer's direct order. "The police did not coerce defendant into driving his vehicle through use or threats of violence. The police officer merely ordered defendant to get in his truck and leave the scene of the fight." *Ante* at 71, 607 *A.*2d at 630. Maybe so, but then again one might suspect that Fogarty, having witnessed the officer subduing his 6'2", 210 pound friend Leonard with a nightstick, might have thought twice about the wisdom of questioning the officer's order to move the truck. Fogarty might have reasoned that he was the nightstick's next target if he did not get in the truck and drive it out of the lot.

As interesting as speculation on such questions may be for an appellate tribunal perusing a cold record, the issue whether Fogarty's reliance on the officer's order was objectively reasonable is initially one for a fact-finder. Unfortunately, we have no fact findings on this record, either by the municipal court—which deemed the issue to be one for a higher tribunal—or by the Law Division, which was unsure of the standard of review

and unaware that Fogarty had testified that he had told the officer he owned the Blazer.

Rather than engaging in unfounded conjecture about whether Fogarty, acting with objective reasonableness, should have declined to drive, informed the officer of his inebriated condition, or obeyed the officer's command, we should remand this case for a new trial. The legal issue of estoppel would then be informed by a standard of objective reasonableness rather than "but for" causation, and the trial court could make the necessary factual and legal determinations.

There is nothing complicated about Fogarty's proffered defense. He contends that he drove only because a police officer wielding a nightstick ordered him to move his truck, and that the circumstances made it unwise for him to refuse or explain that he may have been too drunk to drive. The credibility of his explanation is for a trial court, but this Court dilutes due process when it holds that, even if true, Fogarty's account of the events in the parking lot could not constitute a defense to the DWI charges.

Surely our DWI jurisprudence could accommodate a modest detour to assure that this defendant receives the fair trial to which he is entitled. In addition to our institutional interest in the strict enforcement of the DWI statute, other institutional interests are at stake here as well:

> We should all recognize that our cases may occasionally turn up freakish factual contexts in which the rigid, mechanistic application of a sound, well-established, respected principle of law will produce a result that is plainly at odds with substantial justice. This is such a case. When, as here, there is a collision between law and common sense, this Court should exert its best effort to vindicate good sense. Our institutional legitimacy depends on our succeeding in that endeavor. [*State v. Vick*, 117 *N.J.* 288, 293, 294–95, 566 *A.2d* 531 (1989) (Clifford & Stein, JJ., dissenting).]

CLIFFORD and POLLOCK, JJ., join in this opinion.

*For Reversal and Remandment*—Chief Justice WILENTZ and Justices HANDLER, O'HERN and GARIBALDI—4.

*For Remandment*—Justices CLIFFORD, POLLOCK and STEIN—3.