641 A.2d 1102

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v.
ZAKI ABDELNOOR, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued February 24, 1994—Decided May 24, 1994.

Before Judges GAULKIN, D'ANNUNZIO and WALLACE.

*James K. Smith Jr.,* Assistant Deputy Public Defender, argued the cause for appellant (*Susan L. Reisner,* Acting Public Defender, attorney; *Mr. Smith,* of counsel and on the brief).

*Gilbert G. Miller,* Assistant Prosecutor, argued the cause for respondent (*Nicholas L. Bissell Jr.,* Somerset County Prosecutor, attorney; *Mr. Miller,* of counsel and on the letter-brief).

The opinion of the court was delivered by

WALLACE, J.A.D.

On March 27, 1989, defendant Zaki Abdelnoor was indicted for second-degree conspiracy to distribute heroin in an amount in excess of five ounces (*N.J.S.A.* 2C:35–5 and 2C:5–2); first-degree distribution of heroin in an amount in excess of five ounces (*N.J.S.A.* 2C:35–5a(1) and 2C:35–5b(1)); first-degree possession with intent to distribute heroin in an amount in excess of five ounces (*N.J.S.A.* 2C:35–5a(1) and 2C:35–5b(1)); and third degree possession of heroin in an amount in excess of five ounces

(*N.J.S.A.* 2C:35–10a(1)).  Codefendants Isaac Salmassi and Louis Mather were included in the conspiracy count of the indictment. However, Mather resided in Beirut and was not extradited to the United States for trial.

Following a jury trial, defendant was found guilty of all four counts of the indictment.  The jury was unable to reach a unanimous decision as to codefendant Salmassi, resulting in a mistrial as to him.  After merging all of the convictions into the first degree distribution charge, the trial court sentenced defendant to ten years in New Jersey State Prison with a three year and four month parole disqualifier.[1]  Defendant was also assessed a $3,000 D.E.D.R. penalty for a first degree offense, a $50 lab fee and a $30 V.C.C.B. penalty.

Defendant seeks a reversal of his convictions on the following grounds:

*POINT I:*

DEFENDANT'S MOTION TO DISMISS THE INDICTMENT ON DUE PRO-CESS ENTRAPMENT GROUNDS SHOULD HAVE BEEN GRANTED BE-CAUSE OF THE OUTRAGEOUS AND ILLEGAL CONDUCT OF THE PROS-ECUTOR'S OFFICE IN THIS CASE.

*POINT II:*

EVEN ASSUMING THAT, AS A MATTER OF LAW, DISMISSAL OF THE INDICTMENT WAS NOT REQUIRED, THE JURY STILL SHOULD HAVE BEEN CHARGED ON DUE PROCESS ENTRAPMENT.  (NOT RAISED BELOW).

A.  THE TRIAL COURT COMMITTED PLAIN ERROR IN FAILING TO CHARGE THE JURY ON DUE PROCESS ENTRAPMENT.

B.  IN THE ALTERNATIVE, DEFENSE COUNSEL'S FAILURE TO RE-QUEST A JURY INSTRUCTION ON DUE PROCESS ENTRAPMENT SO PREJUDICED DEFENDANT'S CASE AS TO VIOLATE HIS SIXTH AMEND-MENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.

# I

In December 1987, Karl Pakela was arrested by the Somerset County Police for conspiracy to distribute cocaine.  Pakela agreed

---

[1] Defendant was paroled on June 22, 1992, and detained by the Immigration and Naturalization Service before being deported to Brazil.

to cooperate with the police. He told the police that Louis Mather, whom he met while in prison, planned to bring heroin into the United States. After both men were released from prison, Mather moved to Beirut, Lebanon and wrote to Pakela concerning possible drug deals. Mather and Pakela exchanged letters and had telephone conversations in which Mather told Pakela that he was "setting things up". Mather said that he would know in a couple of months the exact amount of heroin that he would ship.

With this information and Pakela's consent, Detective Timothy Wenzel began listening to telephone conversations between Pakela and Mather. Wenzel listened as Mather discussed a plan to smuggle heroin from Beirut to the United States. However, Mather did not specify the price or quantity of the drugs.

By June 11, 1988, Wenzel felt the discussions between Pakela and Mather had progressed to the point where a deal would likely take place, so he began to tape record their calls. The taping lasted approximately four months and detailed in code the price and quantity of the heroin to be delivered. For example, in the first taped conversation on June 11, 1988, Mather referred to the quantity of heroin as the adoption of five children at once, meaning five kilograms of heroin would be delivered at one time. The price of $250,000 per kilogram was referred to as "the children's average age is two and a half." In a conversation held on August 25, 1988, Mather reduced the quantity of heroin from five to one kilogram.

On October 6, 1988, Mather called Pakela and stated that a courier named Zaki Abdelnoor would arrive at New York's Kennedy International Airport on British Airways flight 179 at nine o'clock that evening with approximately half a kilogram of heroin. Mather described defendant as a man in his sixties, with thick glasses, a tattoo in the center of his forehead, who would be holding silver rosary beads. Mather told Pakela to refer to himself as "Johnny" when he met the courier. The final price for the half kilogram of heroin was $100,000.

The Somerset County Prosecutor's Office organized a plan to apprehend the courier. The plan called for Captain Scott Fabiano and Pakela, covered by members of a surveillance team, to meet the courier at the airport and take him back to a pre-arranged location in Franklin Township. Consistent with this plan, Fabiano and Pakela waited in the terminal and observed defendant walking toward them. Defendant wore thick glasses, had a tattoo on his forehead, and carried silver rosary beads in his hands.

Fabiano and Pakela approached defendant and Pakela identified himself as "Johnny". Defendant nodded in acknowledgement. The three men then walked to a car in the parking lot and drove to the Hilton Hotel in Franklin Township where the police had secured two adjacent rooms, one for the backup team and the other wired for sound. Upon entering the room wired for sound, defendant entered the bathroom and closed the door. Pakela and Fabiano heard "painful, moaning sounds", the sound of a hard object hitting the floor, and the sound of running water. When defendant exited the bathroom he was holding three oval-shaped packages wrapped in blue tape.

Pursuant to Mather's instructions, defendant was paid a $40,000 courier's fee. Defendant accepted the money. After this exchange, Pakela placed a call to Mather to explain what transpired. When Pakela finished talking to Mather, he handed the phone to defendant, who spoke with Mather in Arabic.

Pakela next placed a telephone call to codefendant Isaac Salmassi in New York City using a number provided by Mather. According to the plan, Pakela needed to make arrangements to give Salmassi the remaining $60,000. Upon completion of the call to Salmassi, Fabiano signaled the backup team and defendant was placed under arrest. Subsequent chemical testing revealed that the three solid packages contained approximately twelve ounces of heroin.

Following the trial testimony, counsel for defendant moved to dismiss the indictment on due process grounds because of "outrageous" police conduct. He argued that by importing heroin into

the country without authorization from the Attorney General of the United States, the Somerset County Prosecutor had violated federal law. Further, defense counsel argued that although Pakela and Mather had previously discussed a plan to smuggle drugs into the United States, there was "nothing going on with regard to heroin being brought into this country" until the prosecutor's office "manufactured" a crime to obtain an arrest.

The trial judge stated that he did not know if the prosecutor's office violated federal law, but that even if it did, that fact alone would not "justify the dismissal of criminal charges brought against ... persons for the importation of drugs from another country." The judge stated:

> [T]he police were aware of a situation ... which suggested that people could or might import drugs into the United States ... [and] they provided inducements to those individuals who wanted to bring drugs into New Jersey to sell, to distribute it in New Jersey, and I see nothing wrong with that. That is a common feature of law enforcement that has been traditional for centuries. And I do not know of any case that has ever suggested that the police cannot work in a capacity as an undercover agent, and work with confidential informants to cause those who have a criminal disposition, and those who intended to commit a crime to carry out their purposes, and perhaps even complete them at which time they would be arrested by the police.

## II

At issue in this case is the defense of constitutional due process entrapment. The due process entrapment defense is significantly different than the statutory entrapment defense set forth in *N.J.S.A.* 2C:2–12. The statutory entrapment defense is a combination of two separate entrapment defenses: subjective and objective entrapment. *State v. Fogarty*, 128 *N.J.* 59, 65, 607 *A.*2d 624 (1992). Subjective entrapment "arises when police implant a criminal plan in the mind of an innocent person who otherwise would not have committed the crime so that they may prosecute that person." *Ibid.* Objective entrapment, on the other hand, "does not consider the predisposition of the defendant," but "focuses on the conduct of the police." *Ibid.* Thus, objective entrap-

ment occurs when police conduct is "so egregious as to impugn the integrity of the court that permits a conviction." *Ibid.*

■ In order to prevail under the statutory entrapment defense, a defendant must show that the prosecution's "conduct involve[d] (1) 'methods of persuasion or inducement' that (2) create 'a substantial risk' of the commission of a crime (3) by a person not otherwise 'ready to commit [that crime].'" *State v. Johnson,* 127 *N.J.* 458, 468, 606 *A.*2d 315 (1992). "The Code also imposes a causation requirement, namely, that police conduct 'as a direct result, cause[]' the defendant to commit the crime." *Id.* at 468, 606 *A.*2d 315, *quoting N.J.S.A.* 2C:2–12a; *see State v. Rockholt,* 96 *N.J.* 570, 579, 476 *A.*2d 1236 (1984). Statutory entrapment is an affirmative defense to be determined by the jury which the defendant must prove by a preponderance of the evidence. *N.J.S.A.* 2C:2–12b; *see State v. Florez,* 134 *N.J.* 570, 590, 636 *A.*2d 1040 (1994).

Defendant concedes that since he had no contact with either the prosecutor's detectives or their agent, he was not entitled to raise a statutory defense of entrapment. Instead, defendant rests his argument on a constitutional due process entrapment defense.

■ Constitutional due process entrapment defense "concentrates exclusively on government conduct and the extent of the government's involvement in the commission of the crime." *Florez, supra,* 134 *N.J.* at 584, 636 *A.*2d 1040; *Johnson, supra,* 127 *N.J.* at 470, 606 *A.*2d 315; *Rockholt, supra,* 96 *N.J.* at 580–81, 476 *A.*2d 1236. Under this defense, entrapment occurs when the government conduct was "patently wrongful in that it constitutes an abuse of lawful power, perverts the proper role of the government, and offends principles of fundamental fairness." *Johnson, supra,* 127 *N.J.* at 473, 606 *A.*2d 315. "A determination of due process entrapment requires careful scrutiny of the government conduct in light of all surrounding circumstances." *Florez, supra,* 134 *N.J.* at 584, 636 *A.*2d 1040. Relevant factors to be considered in evaluating this defense are:

(1) whether the government or the defendant was primarily responsible for creating and planning the crime, (2) whether the government or the defendant primarily controlled and directed the commission of the crime, (3) whether objectively viewed the methods used by the government to involve the defendant in the commission of the crime were unreasonable, and (4) whether the government had a legitimate law enforcement purpose in bringing about the crime.

[*Johnson, supra,* 127 *N.J.* at 474, 606 *A.2d* 315].

Unlike statutory entrapment which is an affirmative defense to be determined by the jury, due process entrapment presents a question of law that must be decided by the court.[2] *Florez, supra,* 134 *N.J.* at 584, 636 *A.2d* 1040. Once the defendant has initially put forth "some evidence" of due process entrapment the "State must disprove due process entrapment by 'clear and convincing' evidence." *Id.* at 590, 636 *A.2d* 1040. The "trial court should rely on the evidence presented during the course of the trial and any additional hearings that might be necessary to provide the proper factual basis to make that determination." *Id.* at 591, 636 *A.2d* 1040.

In the present case, the trial judge decided the due process entrapment issue after all the evidence had been presented to the jury. Arguably, defendant presented sufficient evidence of due process entrapment to shift the burden to the State to disprove this defense. However, *Florez* had not yet been decided. Therefore, the trial judge was unaware of the clear and convincing standard necessary for the State to disprove due process entrapment. Accordingly, we now determine whether application of this clear and convincing standard requires a different result.

After careful review of the record and application of the above-noted factors, we are satisfied that the State's actions did not constitute due process entrapment.

Turning to the first factor, "whether the government or the defendant was primarily responsible for creating and planning the

---

[2] Defendant no longer presses his Point II argument that the jury should have been charged on due process entrapment. He conceded at oral argument that *Florez* requires that the court decide this issue.

crime," *ibid.*, it is clear that the government was not primarily responsible. The record does not even remotely suggest that the police impermissibly crossed the line between investigation and instigation. While in prison, Mather crafted a drug trafficking scheme intended to stretch from Lebanon to the United States. Mather and Pakela, without any prodding by law enforcement, later discussed their importation plan. Further, it was Mather who decided how much heroin would be smuggled, how it would be transported, and how the money should be paid. Confronted with the information conveyed by Pakela, the police had adequate justification to investigate further. The mere fact the police monitored Mather's activity with Pakela, and provided through Mather the opportunity for defendant to conduct criminal activity, does not run afoul of the first factor. We have no doubt that in the manner in which the police conducted the investigation here, the government was not primarily "responsible for creating and planning the crime."

The second factor requires consideration of "whether the government or defendant primarily controlled and directed the commission of the crime." *Id.*, 127 *N.J.* at 474, 606 *A.*2d 315. This factor requires examination of " 'the impact of the police activity on the commission of the crime' . . . and 'the importance of the roles played by the government and the defendants in the offense.' " *Id.* at 479, 606 *A.*2d 315 (citations omitted). It also calls for consideration of " 'whether the government provided essential materials or services and the likelihood defendants could have obtained them from another source.' " *Ibid.* Nothing in the record suggests that the government primarily controlled and directed the commission of the crime. On the contrary, Mather decided what quantity of heroin should be smuggled, when and how it would arrive, how much it would cost, and who would serve as the courier. The police merely listened to the conversations as Pakela played the role of a willing buyer. Mather could have terminated the relationship with Pakela at any time. The decision

of whether and how to transact business was at all times controlled by Mather.

The third factor requires determination of "whether objectively viewed the methods used by the government to involve the defendant in the commission of the crime were unreasonable." *Id.* at 474, 606 *A.2d* 315. As observed in *Johnson:*

> Tactics like heavy-handed pressure; repetitive and persistent solicitation, or threats or other forms of coercion; the use of false and deceitful appeals to such humanitarian instincts as sympathy, friendship, and personal need; and the promise of exorbitant gain are generally disallowed because they can overwhelm the resistance of ordinary people.
>
> [*Johnson, supra,* 127 *N.J.* at 478, 606 *A.2d* 315].

*See, e.g., State v. Florez,* 134 *N.J.* 570, 586–87, 636 *A.2d* 1040 (1994) (use of a contingent-fee arrangement as a means of compensating informant may be unreasonable because of "real risk that innocent persons would be pressured into the commission of crimes" as such arrangements create "a powerful incentive to pressure or coerce persons into the commission of crime.").

In evaluating the reasonableness of the techniques employed to investigate a crime, "the type of crime, the level of danger involved, and the circumstances of the suspect are material considerations." *Johnson, supra,* 127 *N.J.* at 480, 606 *A.2d* 315. However, special efforts may be required to cope with the difficulties of investigating drug offenses. *See id.; see also, U.S. v. Russell,* 411 *U.S.* 423, 432–33, 93 *S.Ct.* 1637, 1643, 36 *L.Ed.*2d 366, 373–74 (1973) (drug distribution is difficult to detect without undercover operations); *State v. Talbot,* 71 *N.J.* 160, 168, 364 *A.2d* 9 (1976) ("government properly may use artifice to trap unwary criminals, particularly in its efforts to stamp out drug traffic.").

Defendant contends that the State's conduct was unreasonable and points to Pakela's expressed frustration with the pace of the transaction after Mather quoted a price for the drugs but did not immediately approve a shipment. However, Pakela's comments regarding the timing and the quantity of the shipments are hardly the kind of tactics considered unreasonable as likely to "overwhelm the resistance of ordinary people." *Johnson, supra,* 127

*N.J.* at 478, 606 *A.*2d 315. Mather's responses to Pakela's remarks do not suggest he was being pressured into anything he would not otherwise have done. To the contrary, rather than showing signs of reluctance, Mather was, in his own words, "working [his] best." Nothing in the record suggests that any party to this transaction was coerced, threatened, or intimidated into committing any crime.

Defendant further argues that the violation of federal law was itself a violation of the third factor. He urges that the prosecutor's office violated 21 *U.S.C.A.* § 957 which provides that:

(a) No person may:

(1) import into ... the United States from any place outside thereof ... any controlled substance,

. . . .

unless there is in effect with respect to such person a registration issued by the Attorney General under *section 958 of this title, or unless such person is exempt from registration*....

While 21 *U.S.C.A.* § 957(b)(2) provides that the Attorney General may "waive the requirement for registration ... if he [sic] finds it consistent with the public health and safety," no such exception has been promulgated for state law enforcement agencies. An exception exists for federal law enforcement officers who have been "duly authorized" to import drugs:

The requirement of registration is waived for any officer or employee of the Administration, any officer of the U.S. Customs Service, any officer or employee of the U.S. Food and Drug Administration, and any other Federal officer who is engaged in the enforcement of any Federal law relating to controlled substances, drugs or customs, and is duly authorized to process, import or export controlled *substances in the course of his official duties.*

[21 *C.F.R.* § 1311.25 (1993)].

Under federal law, to "import" a substance means to bring or introduce that substance into the United States from someplace outside the United States. *See* 21 *U.S.C.A.* § 951(a) and § 952(a). *See also, U.S. v. Nusraty,* 867 *F.*2d 759, 766 (2d Cir.1989) ("To convict a defendant of *importing* a controlled substance, the government must show, *inter alia,* that the defendant either

imported the substance or caused it to be imported." (emphasis in original)). Arguably the police neither imported heroin nor caused it to be imported, as they merely monitored conversations between Mather and Pakela in order to ultimately thwart an importation scheme already conceived and in motion prior to the government's involvement. Moreover, Fabiano testified that he advised "several members of the Drug Enforcement Agency [regarding] what was taking place," but "that was the end of their involvement." In light of the police having informed the Drug Enforcement Agency of the investigation, and the limited role the police played in ferreting out the criminal activity, we do not find unreasonable the methods used by the government to involve this defendant.

Finally, addressing the fourth factor, "whether the government had a legitimate law enforcement purpose in bringing about the crime," *Johnson, supra*, 127 *N.J.* at 474, 606 *A.2d* 315, the police clearly had a legitimate law enforcement purpose in conducting the investigation which lead to defendant's arrest. Presented with a strong possibility that Mather would smuggle drugs into this country, the police had ample justification if not an obligation, to take reasonable means to prevent the commission of a serious offense. Defendant's argument that it was unfair to prosecute defendant rather than focus on Mather is without merit. Unlike defendant, Mather did not deliver the drugs and appear in the United States but instead remained in Lebanon. The choice of which criminal to apprehend and which to let go is a choice best left to those assigned the duty of law enforcement.

### III

In summary, we are satisfied that the trial court did not err in denying defendant's motion to dismiss the indictment on due process entrapment grounds. The conduct of the government did not constitute entrapment as a matter of due process.

The judgment is affirmed.