**William E. ALBAUGH, Appellant
(Defendant below),**

v.

**STATE of Indiana, Appellee
(Plaintiff below).**

**No. 24S05–9812–CR–00777.**

Supreme Court of Indiana.

Dec. 17, 1999.

Jack R. Shields, Batesville, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Rosemary Borek, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

### ON PETITION TO TRANSFER

SULLIVAN, Justice.

William Albaugh's pickup broke down one evening shortly before Christmas. He walked home and he and his girlfriend began drinking. Five hours later, a police officer appeared and told him to move his truck. When Albaugh did so, the officer arrested him for driving while intoxicated. We reverse Albaugh's conviction, holding that the State failed to meet its burden of proving that the officer did not cause Albaugh to drive his truck while intoxicated.

*Background*

On December 20, 1995, Defendant William Albaugh and his girlfriend, Jennifer Gray, had an argument about what size Christmas tree to put in their house. Soon thereafter, at around 7:15 p.m., Albaugh left in his pickup truck to visit a friend in Cincinnati. Not more than one-quarter of a mile down the road, however, Albaugh's truck broke down. After an unsuccessful attempt to fix the problem, Albaugh turned on the hazard lights and left the vehicle near the edge of the road. He began walking as the snow fell heavily and eventually arrived back home at approximately 8:00 p.m.

Soon after his arrival, Albaugh and Gray began to make amends. The two began drinking whiskey while discussing what to do about the truck. They also discussed the possibility of using their diesel tractor to tow the truck, but with the weather rapidly deteriorating, they decided to wait until the next morning.

At approximately 12:50 a.m., Deputy Sheriff Dale Maxie, accompanied by Jailer

Barry Bischoff, received a call about a "suspicious" truck parked on the side of a road with its hazard lights flashing. Deputy Maxie and Bischoff located the truck at approximately 1:19 a.m., and Bischoff tried unsuccessfully to start the truck. Deputy Maxie ran a license plate check and discovered that the owner of the truck was William Albaugh, who lived just down the road. The two then proceeded to drive to Albaugh's home.

Upon their arrival, Deputy Maxie and Bischoff approached Albaugh's front door and were able to see him through a front window talking on the phone. They knocked, and Albaugh motioned them into the house eventually hanging up the phone. Deputy Maxie asked Albaugh about his truck, and Albaugh responded that he thought the transmission "froze up." Labeling the truck a potential hazard, Deputy Maxie told Albaugh that the truck had to be removed from the roadway. There was also some discussion about Albaugh and Gray moving the truck with a diesel tractor. Neither Albaugh nor Gray told their two visitors that they had been drinking.

Deputy Maxie and Bischoff left the house and returned to the stalled vehicle to make sure that it would be moved. After waiting a few minutes, Albaugh arrived and walked to the truck. The lights from Maxie's police car illuminated the scene. Albaugh managed to start the truck. After scraping a small hole in the frosted windshield, Albaugh drove off. Deputy Maxie followed and observed a confused Albaugh drive the truck into a cornfield. Albaugh exited the truck, walked toward Deputy Maxie's car and stated that he had been drinking. Deputy Maxie could detect the presence of alcohol on Albaugh's breath. Maxie placed handcuffs on Albaugh and drove him home to inform Gray that he was taking Albaugh to Batesville for a breath test.

Upon arriving in Batesville, Police Officer Steve Yorn, who administered a blood alcohol content test, noticed that Albaugh was "obviously intoxicated." Albaugh's BAC was .19%.

On August 19, 1996, the State charged Albaugh with Operating a Vehicle While Intoxicated,[1] a Class C misdemeanor. One week before trial, the State amended the charging information and added Count II, Operating a Vehicle While Intoxicated,[2] a Class A misdemeanor. Albaugh moved for judgment on the evidence pursuant to Ind. Trial Rule 50 at (1) the conclusion of the State's case-in-chief, (2) after he presented evidence, and (3) again after the jury returned its guilty verdicts, each time claiming the State had failed to present sufficient evidence to rebut his claim of entrapment. The trial court denied each motion.

Without entering a final judgment, the court sentenced Albaugh to one year with all but 60 days suspended, which the court ordered him to serve on work release. After sentencing, Albaugh filed a motion to stay the execution of his sentence pending his appeal. The trial court denied his motion,[3] and Albaugh served his 60-day sentence.

Albaugh appealed claiming that the State had presented insufficient evidence to rebut his defense of entrapment. The Court of Appeals disagreed, affirming Albaugh's conviction. *Albaugh v. State,* 705 N.E.2d 584 (Ind.Ct.App. 1998) (unpublished table decision).

We will recite additional facts as necessary.

1. Ind.Code § 9–30–5–1 (1993).

2. *Id.* § 9–30–5–2.

3. Albaugh also challenges the trial court's denial of his motion for stay of execution pending his appeal. However, Albaugh concedes, and the Court of Appeals agreed, that the issue is moot because he has already completed his sentence. *Cf. Andrews v. State,* 505 N.E.2d 815, 831 (Ind.Ct.App.1987) (finding the applicability of good time credit moot when the defendant has served the full sentence term). We also agree that the issue is moot.

## I

### A

In Indiana, the entrapment defense is defined by our legislature as follows:

(a) It is a defense that:

(1) the prohibited conduct of the person was the product of a law enforcement officer, or his agent, using persuasion or other means likely to cause the person to engage in the conduct; and

(2) the person was not predisposed to commit the offense.

(b) Conduct merely affording a person an opportunity to commit the offense does not constitute entrapment.[4]

 Over the years, this Court rendered inconsistent opinions as to whether the State must disprove both elements (a)(1) and (a)(2) beyond a reasonable doubt,[5] or disprove only one of the two elements.[6] Finally, in *McGowan v. State*, 674 N.E.2d 174 (Ind.1996), *reh'g denied*, we recognized this inconsistency and adopted the latter approach: the State may prove *either* that the "defendant's prohibited conduct was not the product of the police efforts *or* that the defendant was predisposed to engage in such conduct." *Id.* at 175 (emphasis added). We held that because " 'the defense is estab-

lished by demonstrating the existence of two elements, then it is logical that the defense is rebutted by demonstrating the nonexistence of one of those two elements.' " *Id.* (quoting *McGowan v. State*, 671 N.E.2d 872, 880 (Ind.Ct.App.1996)).

### B

The use of the entrapment defense in this case is highly unusual in two respects. First, we have never before been called upon to analyze the defense of entrapment in a situation where the conduct of the law enforcement officials was not for the express purpose of obtaining evidence for the commission of a crime. In the typical situation where a defendant invokes the "entrapment" defense, police officers, working under cover, are accused of enticing an otherwise law-abiding person into violating the law.

Second, the typical entrapment case requires the State to prove beyond a reasonable doubt that a defendant has committed a "specific intent" crime such as dealing in a controlled substance, robbery, or receiving stolen property. The *mens rea* element of the typical offense serves both as a basis to consider the "predisposition" element of the entrapment defense *and* to establish whether the level of police activity persuasively affected the defendant's free will.[7]

---

4. Ind.Code § 35–41–3–9 (1993).

5. *See Smith v. State*, 565 N.E.2d 1059, 1063 (Ind.1991); *Gossmeyer v. State*, 482 N.E.2d 239, 241 (Ind.1985); *Baird v. State*, 446 N.E.2d 342, 344 (Ind.1983).

6. *See Mack v. State*, 457 N.E.2d 200, 202–03 (Ind.1983); *Watkins v. State*, 436 N.E.2d 83, 84 (Ind.1982); *Ryan v. State*, 431 N.E.2d 115, 117 (Ind.1982).

7. *See, e.g.*, *Riley v. State*, 711 N.E.2d 489 (Ind.1999) (finding evidence that defendant was familiar with drug jargon and prices, that he engaged in multiple transactions, and that he undertook to arrange future transactions was sufficient to show that defendant was predisposed to dealing in controlled substances and was not entrapped, supporting his conviction for cocaine dealing); *Dockery v. State*, 644 N.E.2d 573 (Ind.1994) (finding evidence of defendant's possession of pistol-

grip shotgun and one and one-tenth ounces of marijuana two years prior to the current charge was insufficient to prove predisposition to deal in cocaine); *Gray v. State*, 579 N.E.2d 605 (Ind.1991) (rejecting defendant's entrapment defense to charge of dealing in cocaine after considering testimony of witness that the defendant had gotten marijuana for her and testimony of undercover officer that the defendant told him to check with her later concerning purchase of cocaine); *Ryan v. State*, 431 N.E.2d 115 (Ind.1982) (rejecting defendant's entrapment defense to charge of dealing in cocaine after considering evidence establishing that defendant approached the police officers, was the first to mention heroin, knew the price, how much to use, where to obtain it, and obtained it and sold it and, in effect, was predisposed to commit the crimes).

Here, the State was not required to prove Albaugh's culpability given that the offense of operating a vehicle while intoxicated has been held to lack a *mens rea* element. *See English v. State*, 603 N.E.2d 161, 165 n.7 (Ind.Ct.App.1992); *see also Smith v. State*, 496 N.E.2d 778 (Ind.Ct. App.1986) (noting that proof of *mens rea* is not required for conviction of driving while intoxicated causing death); *accord* 1Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 3.8, at 340 n.1 (1986 & Supp.1999) (providing that common examples of strict liability criminal statutes which impose liability without fault usually concern liquor and narcotics laws, pure food laws, and traffic laws).

We have previously considered the entrapment defense in the context of the strict liability crime of furnishing an alcoholic beverage to a minor. *Baird v. State*, 446 N.E.2d 342 (Ind.1983). In *Baird* we found that

> [t]he state presented absolutely no evidence of defendant's predisposition to commit the crime. The proscribed activity in this case was entirely initiated by the police, and their agent ... was recruited specifically for the purpose of purchasing an alcoholic beverage from defendant. From all of these facts, it is apparent that the state failed to rebut defendant's defense of entrapment.

*Id.* at 344. Although we were following the pre-*McGowan* rule that the State must disprove both elements of the entrapment defense, we found persuasive the fact that "[t]he police testified that they had no complaints that defendant had been selling alcoholic beverages to minors ... [and the d]efendant had no prior criminal record," *id.* at 343, in reversing the judgment of the trial court and remanding with instructions to enter a judgment of not guilty.

## II

■ It is beyond contention that Defendant was *not* predisposed that evening to drive his vehicle while intoxicated. In the words of the Court of Appeals, "Albaugh argues convincingly, and the evidence suggests, that Albaugh and his girlfriend had settled in for the evening and had decided not to move the truck until the following morning." *Albaugh*, Slip Op. at 6 n.4. Because the predisposition element of the entrapment defense is not at issue, the outcome of this case turns on whether the State presented sufficient evidence to rebut the product-of-police-efforts element. In that respect, the State had the burden of proving beyond a reasonable doubt that Albaugh's conduct in driving while intoxicated was not the product of Deputy Maxie using persuasion or other means likely to cause Albaugh to engage in the conduct. The Court of Appeals determined that "it was reasonable for a trier of fact to conclude that Deputy Maxie's conduct did not cause Albaugh to drive his truck while intoxicated." *Id.* at 6. We disagree.

In this case, the evidence suggests that at around 1:30 a.m., Deputy Maxie and Bischoff approached the front door to Albaugh's home. With flashlight in hand, Deputy Maxie pounded on the door, explaining later that "we were trained to knock hard to get people's attention." (R. at 125.) Deputy Maxie could see Albaugh through a front window talking on the phone. Albaugh motioned the two men inside the house and they shut the door behind them. The house was dimly lit. Jennifer Gray was seated at a table in another room with a blanket draped over her, wearing her moccasins. (R. at 187.)

Deputy Maxie asked, "[I]s your name William Albaugh?" (R. at 224.) Albaugh responded, "Yes," and Deputy Maxie followed up with, "Do you own a red pickup that's parked down the road?" *Id.* Albaugh again answered affirmatively. *Id.*

Deputy Maxie then began questioning Albaugh about the truck. Albaugh responded that he thought the transmission "froze up." (R. at 85.) Deputy Maxie testified, "I told him it had to be removed. The vehicle had to be removed out [of] the roadway before it was a hazard." (R. at 131.) Bischoff also testified, "We told him that it had to be moved." (R. at 101.) In response to defense counsel's question,

"You said tonight though?," Bischoff responded, "Yeah, exactly, it's in the middle of the road on a country road. You can't park a truck in the middle of the road." *Id.*

Deputy Maxie testified that Albaugh quickly offered that he and his girlfriend would "be up with the tractor to pull it out of the roadway." (R. at 129.) Gray testified: "Bill said, well, I really can't move it now because our diesel tractor won't work in this cold, and we're going to have to wait until the morning. And Officer Maxie said, well, you've got to move it and you've got to move now." (R. at 191.)

Albaugh testified, "I wasn't going to be belligerent. I had no reason to be, but I was trying to explain to the Officer that we were going to move it in the morning. And it was just, you know, that was unacceptable, and it had to be moved." (R. at 228.) Eventually, Albaugh said "ok" to moving the truck. (R. at 228.) He continued explaining,

I wanted them out of my house at this point because I didn't want to challenge their authority, which I was kind of doing by saying we'd get it tomorrow. Well, that's unacceptable, and back and forth.... So, I said, ok, I want them out, and I said, we'll go do it. I even said Jenny and I would be down to do it.

(R. at 228–29.)

Deputy Maxie and Bischoff returned to the location of Albaugh's broken down truck. After waiting a few minutes, a green car pulled into a driveway near the truck. Despite the fact that just minutes prior they had not been able to start the vehicle, neither one offered Albaugh their help in moving or starting the vehicle in difficult conditions that Deputy Maxie himself described as "cold [with] snow and ice on the road." (R. at 125.)

With the lights from Maxie's squad car illuminating the scene, they watched Albaugh exit the green car, unexpectedly start the truck and drive off. Soon thereafter, Deputy Maxie arrested Albaugh for driving while intoxicated.

We find the evidence insufficient to establish beyond a reasonable doubt that Albaugh's conduct in driving while intoxicated was not the product of Deputy Maxie using persuasion or other means likely to cause Albaugh to engage in the conduct. Reading the testimony in the light most favorable to the State, we find no evidence that Albaugh's decision to drive the truck was anything other than the product of Deputy Maxie's persuasion (if not explicit direction or order).

### III

This is not the usual case of a motorist who drives a motor vehicle while under the influence of alcohol. Here, a law enforcement officer played a *direct role* in influencing Albaugh to *leave his home* in the middle of the night to move his truck, only minutes later arresting him for driving while intoxicated. As the Court of Appeals said, "the evidence suggests that Albaugh and his girlfriend had settled in for the evening and had decided not to move the truck until the following morning." *Albaugh*, Slip Op. at 6 n.4; *accord Williams v. Crist*, 484 N.E.2d 576, 578 (Ind.1985) ("[T]he intoxicated driver is guilty of willful and wanton misconduct when he deliberately assumes control of an automobile and places it upon a public highway."); *Kolkman v. Falstaff Brewing Corp.*, 511 N.E.2d 478, 479 (Ind.Ct.App. 1987) (same); *Roberts v. Chaney*, 465 N.E.2d 1154, 1161 (Ind.Ct.App.1984) (Ratliff, J., dissenting in part and concurring in part) ("Becoming intoxicated ordinarily is the result of the conscious and intentional act of the drinker.... Further, driving a motor vehicle is not an involuntary act. On the contrary, it is an act performed deliberately and intentionally by the driver.").

We are mindful of other decisions in foreign jurisdictions that have declined to recognize the defense of entrapment to a charge of driving a vehicle while intoxicated. But our research failed to uncover a single case where a defendant was per-

suaded by police to leave his or her home to engage in the prohibited conduct. To the contrary, these cases involve individuals who have already driven away from home, made the decision to drink, and then later find themselves in various situations responding to a police directive to drive their automobile.[8] Were these events to occur within Indiana's borders, we think it likely that the State could easily establish that these motorists had the predisposition to drink and drive, and that the police conduct "merely afford[ed the] person an opportunity to commit the offense." Ind. Code § 35–41–3–9(b). We do not anticipate that our decision today will generate a flood of "entrapment" litigation premised on police activity somehow affecting the free will of drunken drivers.

### Conclusion

We therefore grant transfer, vacate the opinion of the Court of Appeals, reverse the trial court, and remand with instructions to enter a judgment of not guilty.

SHEPARD, C.J., and BOEHM and RUCKER, JJ., concur.

DICKSON, J., dissents with opinion.

DICKSON, Justice, dissenting.

As noted by the majority, the statutory entrapment defense applies only when "the *prohibited conduct* of the person was the product of a law enforcement officer, or his agent, using persuasion or other means likely to cause the person *to engage in the conduct*." Ind.Code § 35–41–3–9(a)(1) (emphases added). The "prohibited conduct" for which the defendant was convicted was operating a vehicle while intoxicated.

Deputy Maxie may have persuaded the defendant to move the vehicle, but not to drive while intoxicated. The defendant

had a choice among various means by which to have the vehicle moved and chose to drive it himself while intoxicated. Furthermore, the conduct of Deputy Maxie at most merely afforded the defendant "an opportunity to commit the offense," which the statute expressly declares "does not constitute entrapment." Ind.Code § 35–41–3–9(b).

---

8. *See, e.g., State v. Fogarty*, 128 N.J. 59, 607 A.2d 624 (1992) (finding the defendant was not entrapped into driving under the influence when a police officer, responding to a brawl at a wedding reception and attempting to control the crowd that had gathered around the fight, ordered the defendant to leave the parking lot); *Adams v. State*, 585 So.2d 161 (Ala.1991) (finding the defendant was not entrapped into driving under the influence when a state trooper, finding defendant's vehicle on the highway shoulder, instructed the defendant to get back onto the road).